(No. 31263.—

BRUCE LINDROTH, Appellee, *vs.* WALGREEN COMPANY *et al.,* Appellants.

*Opinion filed September 21, 1950—Rehearing denied Nov. 17, 1950.*

Lord, Bissell & Kadyk, of Chicago, (L. Duncan Lloyd, Gordon R. Close, and Leonard F. Martin, of counsel,) for appellant Walgreen Company; Werner W. Schroeder, and Querrey & Harrow, both of Chicago, (Theodore W. Schroeder, and James E. Hastings, of counsel,) for appellant Knapp-Monarch Company.

Joseph D. Ryan, and Louis P. Miller, both of Chicago, for appellee.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

Suit was brought in the superior court of Cook County in behalf of Bruce Lindroth, a minor, against Knapp-Monarch Company, manufacturer, and Walgreen Company, seller of an electric vaporizer, for personal injuries to said minor as a result of burns received in a fire which appellee claims was caused by such vaporizer. The cause was tried by a jury and a verdict was returned against both defendants for $65,000. Motions for a new trial, in arrest of judgment and for judgment notwithstanding the verdict were overruled, after which judgment was entered on the verdict. Leave to appeal being granted, appellants, Knapp-Monarch Company and Walgreen Company are here seeking to reverse this judgment which was affirmed by the Appellate Court.

The complaint alleged that Knapp-Monarch Company carelessly and negligently manufactured and sold, with knowledge that it would ultimately be offered for sale to the general public, a vaporizer that was defective and dangerous, in that when used in accordance with the printed directions accompanying it and in the manner and for the purpose intended, it was likely to melt and set fire to nearby objects and cause persons using it to be severely burned, and was therefore an inherently dangerous instrument; that it negligently failed to provide a cutout device which would automatically cut off the current before the vaporizer reached the temperature at which it was likely to set fire to surrounding objects and cause persons using it to be burned; that it failed to properly inspect and test said vaporizer and negligently represented to the public generally that said vaporizer was safe for the use for which it was intended, and that no danger from flame or fire could be incurred in so using it.

The complaint further alleged that the Walgreen Company acquired said vaporizer and offered it to the public

for sale; that the mother of plaintiff purchased the vaporizer from Walgreen Company and made known to it the particular purpose for which it was required, and relied upon the seller's judgment and upon the representations of both appellants that the vaporizer was reasonably fit for the purpose intended and that no danger from flame or fire would be incurred in using it; that Walgreen Company negligently sold the plaintiff's mother a vaporizer that was dangerous and defective in that when used in the manner and for the purpose for which it was intended the metal thereof was likely to melt and set fire to the surrounding objects and cause persons using it to be severely burned; that it negligently sold plaintiff's mother a vaporizer which was not reasonably fit for the purpose for which it was intended to be used, because when used in the manner and for the purpose intended it was likely to set fire to surrounding objects and cause persons using it to be severely burned, and thereby negligently breached its warranty given by virtue of the provisions of section 15 of the Uniform Sales Act, (Ill. Rev. Stat. 1939, chap. 121½, par. 15,) that the said vaporizer was reasonably fit for such purpose; that it expressly warranted the said vaporizer to be safe for use without attention for at least two hours; that such warranties were believed and relied upon.

The answer of Knapp-Monarch Company admitted it manufactured a device known as a Kwikway Electric Vaporizer, but denied all other allegations.

The answer of Walgreen Company admitted it sold to the public at retail vaporizers manufactured by Knapp-Monarch Company and denied all other allegations.

The record discloses that on May 8, 1940, appellee, fourteen months of age, was seriously burned while lying in a crib in an upstairs room of his home as a result of fire reaching his crib and igniting that part of his snuggle-bunny (a loose sack-like blanket) adjacent to the left side of his head and face. The crib in which he was resting

was about four and one-half feet long and two and one-half feet wide, and stood with head to the north in the northeast corner of a room about eleven by twelve feet with a ceiling height of eight feet. The room faced the west, having two windows to the front and one window on the north side. A double-deck bunk with head to the west stood along the north wall just west of the window. Lace curtains at the north window hung down to a point just below the sill or just to the top of the baseboard. There was an electric outlet or wall socket below and to the west of the north window for the connection of electrical appliances.

Appellee's mother had used a vaporizer in his room prior to the date in question but it was broken and she purchased a new one from the Walgreen Company, manufactured by the Knapp-Monarch Company. The old vaporizer had an automatic cutout which stopped the flow of electricity into the heating element after a certain temperature had been reached, usually after the water had all evaporated. The mother inquired of the saleslady at Walgreen's if the Qwikway vaporizer she was considering had an automatic cutout and was advised that it did not have such device. The patent application provided for an automatic cutout which was found by the manufacturer, working with the inventor, to be not dependable and was not used in the manufacture of the article.

Some makes of vaporizers had cutouts which operated successfully, while other makes did not have such devices. The saleslady stated in substance that the vaporizer would not boil dry for about two hours if filled with water according to the directions. The mother testified that by "about two hours" she had in mind that it would run at least for an hour or from one hour to an hour and a half anyway without being watched and without boiling dry. The saleslady told her that a doctor in the neighborhood was using one of these vaporizers for his patients and that he

recommended it. It was explained to the mother that there were directions in the container which she should follow and, which, according to the mother's testimony, she did follow. She purchased the vaporizer and took it home. She did not purchase a new electric cord with which to attach it to the wall outlet but used an old one that had been in use for about a year.

The directions with the vaporizer read to fill the container about three quarters full of water which brought the water to within an inch or an inch and a half of the top. Above the container was a place for medicated cotton through which the vapor would pass. Below the container was the heating element, and immediately below that was an asbestos disk about one-eighth inch thick and four inches in diameter held in position by a spring in the bottom plate.

Soon after returning home, the mother went into the kitchen and filled the container with tap water to within about an inch and a half from the top and found no leak. She then took it up to the bathroom and plugged it into an electric outlet, and in about four minutes the water began to vaporize. She testified: "There were no leaks in this container that I could observe." She then disconnected it, sponged off appellee, rubbed medicine on his chest, placed a snuggle-bunny around him, zipped it up under his chin and placed him in the crib for a nap. The maid had just brought up a nursing bottle containing orange juice which was given to him. The mother then placed a doll's high chair about one foot west of the baby's crib and near the middle of it or about two and one-fourth feet from the north window. She then set the vaporizer on the chair and plugged it into the wall socket near the north window.

The doll's chair was wooden, had four posts or legs, a seat about five inches square and a small foot rest in front. The back was not solid but consisted of a cross-piece supported by three little rungs. There was an armrest on

each side, also supported by a rung in each corner. It resembled very much a baby's high chair cut down to doll's size. The seat was about even in height to that part of the crib upon which the baby lay. The spout of the vaporizer was placed so that the vapors would go up over the baby's nose. Vapor was soon noticed coming from the spout, whereupon the mother left the room. In a few minutes she returned, peeped into the room and saw that the orange juice had been consumed and that the baby was just turning onto his stomach. At that time the vaporizer was operating properly and emitting vapor more satisfactorily than did the old one. At no time did the mother notice anything wrong with the vaporizer. She noticed no leakage of water and according to her testimony it was operating properly when she last saw it before the fire.

After peeping into the room, the mother went downstairs and within a period of between thirty and forty-five minutes a neighbor lady rushed over and excitedly announced that smoke was coming from an upstairs window. The mother rushed to the child, lifted him from the crib and carried him from the smoke-filled room. The snuggle-bunny was burning near the left side of his head and face. She tore it from him, rushed him downstairs and to the hospital. He was found to be suffering from third degree burns and was severely and permanently injured.

A lady who had been visiting with the mother just prior to the alarm immediately thereafter called the fire department. The fire occurred about five o'clock in the afternoon. After the baby had been removed, two volunteer firemen were the first to enter the room and they found it full of smoke. They opened the windows and extinguished the fire. One of the firemen testified that the electric cord was already detached from the vaporizer at that end but was still in the wall socket. An examination of the cord showed the insulation worn and frayed and some wire exposed at the vaporizer end but it was not burned

away at that end. Where it was connected with the wall socket the insulation had burned off for a distance of four or five inches leaving the wires exposed. The hard rubber knob or plug at this end of the cord was burned and had melted out of shape. The wallpaper around the socket at the north wall was burned. The fireman saw the vaporizer on the doll chair but did not remove it. He tried to get the stuff that was burning out of the room, bed clothing, a mattress and part of the double-deck bed. The curtains had been burned off.

The wooden double-deck bed, particularly the upper portion of it at the foot end was burning. The fireman did not touch the electric cord for fear it would be too hot. He did not know whether there was any water in the vaporizer but said that it was not red or glowing that he noticed. He testified that the vaporizer was midway between the head and foot of the crib right alongside of the bed, maybe not up against the bed but a couple of inches away. He did not pay any particular attention to the stand that the vaporizer was on but noticed that it was burning around the top. He noticed something else burning at that place, the stuff that was around the outer edges of the vaporizer. It was a black substance and appeared to be like burned cloth. The evidence shows the vaporizer was set on top of a pot holder, the texture of which is not clearly shown but the mother thought the outer covering was cloth with some sort of stuffing inside.

The distance between the crib and the double-deck bed was about two and one-half feet and the stand upon which the vaporizer stood was placed approximately halfway between them. After the fire was extinguished the vaporizer was found to be blackened by smoke and soot. Part of the container had melted and a portion of the molten aluminum had dropped down to the seat of the chair. The heating element was found to be working properly when tested after the fire. The back and arms of the chair with

their supporting rungs were practically all consumed by the fire and the surface of the seat was charred but had not disintegrated. The mother testified that she did not connect any sort of cloth, sheet, towel or pillow slip to the vaporizer nor did she place any such material against it or any part of it and that there was no cloth or any material extending from the crib, nor did she place any drape or blanket or cloth or anything like that around the bottom of the vaporizer.

The evidence shows that through literature the manufacturer represented that the vaporizer was safe and that there was no danger from flame occurring as a result of its use.

There was a great deal of expert testimony concerning the construction of the vaporizer, explaining its component parts, showing how it operated and indicating the various tests to which it and like instruments had been subjected and the result of those tests. This testimony would serve a purpose if we were considering the weight of the evidence, but inasmuch as we are not, that phase of the case will not be discussed.

In response to special interrogatories the jury answered that the vaporizer was an inherently dangerous instrument and that the mother was not guilty of negligence which contributed to cause the accident and injury complained of. The mere fact that the fire occurred, resulting in an injury to appellee, does not authorize the presumption or inference that the appellants or either of them were responsible therefor. The burden was on the appellee to prove that the vaporizer caused the fire. *Huff* v. *Illinois Central Railroad Co.* 362 Ill. 95; *Rotche* v. *Buick Motor Co.* 358 Ill. 507; *Bowman* v. *Woodway Stores, Inc.*, 345 Ill. 110.

The errors assigned are as follows: (1) That defendants' motions for directed verdict and for judgment notwithstanding the verdict should have been sustained by the trial court; (2) that it was error to submit interrogatory

No. 1 to the jury; (3) that plaintiff's attorney made improper and prejudicial argument to the jury, constituting reversible error.

The crucial question presented is whether it was error for the trial court to overrule defendants' motions for a directed verdict and for judgment notwithstanding the verdict.

A motion for directed verdict or for judgment notwithstanding the verdict presents the single question whether there is in the record any evidence which, standing alone and taken with all its intendments most favorable to the party resisting the motion, tends to prove the material elements of his case. *Gorczynski* v. *Nugent*, 402 Ill. 147; *Weinstein* v. *Metropolitan Life Ins. Co.* 389 Ill. 571.

There is considerable argument over evidence in the record tending to show that the fire might have been caused by other agencies than the vaporizer. This court, of course, on the contention here in issue, is not concerned with the weight or credibility of the evidence, but only with the narrow question whether there is any evidence, together with all reasonable inferences to be drawn therefrom, which would justify submission of the case to the jury.

The following salient facts appear: The vaporizer was purchased under the express warranty that it was safe for its intended use. It was placed in operation in accordance with directions prepared by the manufacturer and delivered by the seller. The plaintiff's evidence is that forty-five minutes later the vaporizer was dry and melted and the room in which it was placed was in flames. There is no question but that the heat of the molten metal was sufficient to ignite the doll chair on which the vaporizer was sitting and which was burning under and around the vaporizer when the fire was discovered. No one saw the vaporizer melt or the fire start and the ultimate question is whether the fire was caused by a defect in the vaporizer. If, from the circumstances revealed by the evidence, it is reasonable to infer

that the fire was caused by a defect in the vaporizer the case was properly submitted to the jury, otherwise not.

The key point of the controversy is appellants' contention that the fact of defect must be proved before it may be inferred that such defect caused the fire and the injury complained of. There being no eyewitnesses, the determination of this contention must be found in the circumstances revealed by the evidence, if at all. The metal of the container was melted. The vaporizer contained within it a source of intense heat. It is clear from the evidence that a properly constructed vaporizer could not melt itself down and it would seem inescapable that if the vaporizer did in fact melt by the application of its own heat, it was defective. It is apparently the appellants' contention that before that conclusion may be reached it must appear that some physical evidence of improper construction of the vaporizer must be found. The only physical fact proved from which any inference of defect could be based is that the container was melted. Is that such a circumstance as to be a basis for a reasonable inference of defect?

In *Colbert* v. *Holland Furnace Co.* 333 Ill. 78, a cold-air grating was installed by the defendant and a year later it gave way under the plaintiff's weight causing the injury complained of. The cleat which held the grating was in evidence and appeared to be cross-grained and a break in it appeared which followed the cross-graining. Because of the circumstances of the broken cleat this court held that the jury could reasonably infer that it was defective and that its defect caused the injury.

In *Showalter* v. *Western Pacific Railroad Co.* 16 Cal. 2d 460, 106 Pac. 2d 895, deceased was found fatally injured during the switching of certain cars in a railroad yard. The question was whether the injury was caused by the negligence of defendant's employees in moving the cars. There was no eyewitness but there was evidence that the defendant's employees jostled the cars at about the time

and at the place when the injury occurred without first ascertaining the whereabouts of deceased. The California court held that the jury could reasonably infer that such jostling of the cars knocked the deceased off the car on which he was riding and caused the injury. The presence, in the circumstances of that case, of all the necessary facts from which the injury could have resulted was the basis of that decision. Here, the vaporizer contained all the requirements for its own destruction if it was defective, and it was in fact destroyed.

In *E. K. Wood Lumber Co.* v. *Anderson*, 81 Fed. 2d 161, the deceased, a fisherman, was found drowned, his boat destroyed, and on a piece of it was a smear of red paint. It appeared that defendant's steamer was plying the waters in which deceased was drowned at the time and place in question and that it was the only such vessel in the vicinity. Its hull was painted red. There was no eyewitness but the court held a reasonable inference could be drawn that defendant's steamer collided with and destroyed the deceased's boat and caused his death. The basis of decision was that, all circumstances being present necessary to cause the result, the causative fact could be reasonably inferred. Here, the vaporizer contained all the elements necessary to cause the fire, if it was defective. The circumstances show that it was in fact melted and that a fire existed. It would seem that the existence of a defect could reasonably be inferred. In the cited case the deceased was dead and his boat destroyed and it was held reasonable to infer that defendant's steamer destroyed the boat and caused the drowning. Here, the container was melted and the room was ablaze in forty-five minutes.

In *Lavender* v. *Kurn*, 327 U.S. 645, 66 S. Ct. 740, the deceased, a switch tender, was found dead alongside defendant's railroad tracks. The evidence showed he had been struck in the head by some object which fractured his skull and caused his death. There was no eyewitness.

It was shown that during the time that deceased was at the place of his injury a train passed which was equipped with a mail hook which, if it was extended, could have struck the deceased and inflicted the injury. The question was raised as to whether the jury could reasonably infer from these facts that the hook struck and killed deceased. It was not shown that the hook was in fact extended at the time and place of deceased's injury, and it did appear that, except for an elevation in one place in the ground along the track, the hook, even if extended, was too high to have struck the deceased standing on the ground. The court held the case, on this evidence, was properly submitted to the jury, and that it could reasonably be inferred that the death was caused by the extended hook. It was there said, "Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear."

In the case of *Tennant* v. *Peoria and Pekin Union Railway Co.* 321 U.S. 29, the court, in holding the evidence was sufficient to submit the case to the jury, said, "The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury." In the instant case the evidence shows without dispute that the vaporizer was placed in operation according to directions and that forty-five minutes later it was melted and the room was afire. It is also undisputed that a properly constructed vaporizer could not have melted under those conditions. It seems that the jury could reasonably draw the conclusion that the vaporizer involved here was defective.

In *Devine* v. *Delano, 272* Ill. 166, and *Town of Cicero* v. *Industrial Com.* 404 Ill. 487, this court held the rule to

be that reasonable inferences may be drawn from established facts and all that can be reasonably required to establish controverted facts, whether the evidence be direct or circumstantial, is that the evidence creates a greater or less probability leading, on the whole, to a satisfactory conclusion.

In the instant case appellants' position seems to be that the melted condition of the container is not any evidence of defect and that when the evidence favorable to plaintiff is considered, it must be considered as if the vaporizer had not melted and was in good condition after the fire. Obviously, if the vaporizer had been in the same condition after the fire as it was in before, then an inference of defect would be pure conjecture and the jury could not have reached such a conclusion. The record discloses, however, that the vaporizer was melted, a fact which appellants argue could not have been caused by the vaporizer itself. It is that fact which gives rise to the inference drawn below that the vaporizer, being defective, destroyed itself and caused the fire. The fact the melt occurred in a small area of the container's surface and its degeneration was not general, points to a reasonable inference that the defect was localized in that small area. The fact that there is evidence that might have been a reasonable basis for inference that the fire was caused by a defective cord, and that the melting was a result of the fire and not its cause, is all beside the point. The inquiry here is whether the result reached below was one which is reasonable on the facts in evidence, not whether other conclusions might also have been reached.

In *Carter* v. *Yardley Co.* 319 Mass. 92, 64 N.E. 2d 693, the plaintiff suffered burns after the use of perfume manufactured by the defendant. The particular ingredient in the perfume which caused the burns was not established. The plaintiff there introduced several witnesses who had suffered similar burns from the perfume and the court held that such evidence was properly submitted to the jury to

show the probability that the burns were caused by some harmful ingredient in the perfume. In that case, as in this, the precise nature of the defect in the perfume was not shown, but the fact that the plaintiff was burned was held sufficient to raise a probability that a defect existed. In the instant case it could as well be said that the fact the vaporizer was melted and the room was ablaze was sufficient to raise the probability that the melting and fire was the result of some defect in the vaporizer.

While it is the rule that where circumstantial evidence is relied upon to prove a fact, the circumstances must be proved and not themselves presumed, (*Ohio Building Safety Vault Co.* v. *Industrial Board,* 277 Ill. 96,) that rule is not offended by the result reached below in the instant case. The circumstances of the melting of the container in one small area of its surface is a circumstance from which a reasonable inference may be drawn that a defect was present at that point. The fact that the evidence shows that a sound vaporizer could not and would not have melted as this one did proves nothing with regard to the vaporizer involved here but is additional support for an inference that, since this one did melt, it must have been defective.

The argument of appellants that the melting was due to the heat of the fire and not that of the heating element in the vaporizer is likewise based on an inference, for there is no direct evidence to support it. A verdict may not be set aside merely because the jury could have drawn different inferences or because judges feel that other conclusions than the one drawn would be more reasonable. (*Jefferson Ice Co.* v. *Industrial Com.* 404 Ill. 290; *Heiting* v. *Chicago, Rock Island and Pacific Railway Co.* 252 Ill. 466; *Tennant* v. *Peoria and Pekin Union Railway Co.* 321 U.S. 29, 64 S. Ct. 409.) There is no complete absence of probative facts to support the inference drawn here and therefore the trial court properly overruled appellants' motions for directed verdict and for judgment notwithstanding the verdict.

Appellants also urge error in the submission to the jury of the special interrogatory which reads, "Was the vaporizer in question when used in accordance with the printed directions accompanying it in the manner and for the purpose intended, an inherently dangerous instrument?" The complaint in this case alleges that the vaporizer was inherently dangerous and defendants denied it. It was one of the issues in the case and defendant Knapp-Monarch Company caused the jury to be instructed that before plaintiff could recover it must have been proved that the defendant knew or by reasonable care should have known the vaporizer here was a potentially dangerous instrumentality and if there were any defect in it, "it was reasonably certain to endanger the life or limb of other persons than the purchaser when used in the manner and for the use intended."

In view of the defendant's position in that instruction, it is hard to see how the interrogatory was so prejudicial as to require reversal. A judgment will not be reversed for error unless it appears such error affected the outcome below. *Pease* v. *Kendall,* 391 Ill. 193; *Devine* v. *Delano,* 272 Ill. 166.

Defendants also contend that plaintiff's attorney made improper argument to the jury by referring to judgments obtained in other actions and by referring to defendants as "large corporations." No objection was made at the time the argument was made, nor was the court requested to take any action regarding the remarks until after the verdict. This question is not open for consideration in this court in such case. *People* v. *Switalski,* 394 Ill. 530; *Forest Preserve Dist.* v. *Chicago Title and Trust Co.* 351 Ill. 48; *Chicago City Railway Co.* v. *Gemmill,* 209 Ill. 638.

Only when there is a complete absence of probative facts to support the conclusion drawn by the jury is it reversible error to overrule a motion for judgment notwithstanding the verdict. We are of the opinion that here there is an

evidentiary basis for the jury's verdict and that the jury is free to disregard or disbelieve whatever facts are inconsistent with its conclusion. The Appellate Court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable. We are of the opinion the court properly overruled defendants' motions for directed verdict and for judgment notwithstanding the verdict, and therefore the judgment is affirmed.

*Judgment affirmed.*

Mr. JUSTICE CRAMPTON, dissenting.