**William CARLSON, Plaintiff-Appellee,**

v.

**CHISHOLM–MOORE HOIST CORPORA-
TION, Defendant-Appellant.**

**No. 321, Docket 26013.**

United States Court of Appeals
Second Circuit.

Argued June 6, 1960.

Decided July 19, 1960.

See also 21 F.R.D. 144.

Harvey Goldstein, New York City (Silas B. Axtell, Goldstein & Sterenfeld, New York City, and John Gleason, Manhasset, L. I., on the brief), for plaintiff-appellee.

Patrick E. Gibbons, New York City (Ralph H. Terhune and Galli, Terhune, Gibbons & Mulvehill, New York City, on the brief), for defendant-appellant.

Before LUMBARD, Chief Judge, and CLARK and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

This action was brought in the District Court for the Southern District of New York by Carlson, a citizen of Texas, against defendant, a New York corporation, to recover for an injury suffered in Texas and allegedly caused by defendant's negligent manufacture of a chain hoist. The appeal presents questions whether there was sufficient evidence of defendant's negligence to support the jury's verdict for the plaintiff and whether certain testimony offered by plaintiff was properly received. We affirm.

Carlson was employed as a millwright by the Austin Company in Houston. On the morning of April 20, 1950, he was engaged, along with several co-workers, in inserting heavy pistons into the cylinders of a large machine press. Each piston was brought to "working distance" of the press by a large overhead crane. In order to achieve the delicate control over the piston necessary for the final installation, the workers would then attach a chain hoist to the crane. The basic physical principle of the hoist is that of the lever. An external wheel, manipulated by an attached chain, turns a set of gears, which turn another wheel to which the load is attached by another chain. When one pulls on the hand chain so as to cause the hand wheel to move in one direction the load is raised, and in the other direction, lowered. In the so-called one-ton hoist here involved, which in fact is geared to handle loads of 3,000 pounds, the hand chain has to be pulled about three feet to move the load one inch. Unlike a simple block and tackle, the chain hoist also contains a braking device, so that when the operator ceases to pull on the hand chain, the very weight of the load forces a friction disc attached to the hand wheel against another friction disc and prevents further motion of the load.

The piston involved in the accident had a diameter of twelve inches throughout most of its length of 30 to 36 inches and weighed about 2,200 pounds. On the day of the accident twelve similar pistons had been installed by use of a hoist with "a long pull chain." When the time came to install the thirteenth piston, one of Austin's employees removed from a packing crate a new one-ton aluminum hoist manufactured by defendant; this had a shorter chain. The hook at the end of its load chain was affixed to an eyebolt which had been screwed into the head of the piston. Plaintiff's witnesses testified, without contradiction, that chain hoists required no preliminary adjustment or testing and that it was customary to put them to use just as they came from the packing crate.

Carlson was stationed on some scaffolding adjacent to the steel die or table, to which the piston was to be lowered from about twenty inches above. Upon a signal from him and another member of the crew, the hoist operator pulled the hand chain in the down direction for about three feet. At that moment Carlson's hands were resting on the die directly under the piston, he being engaged in wiping some grease and foreign matter from the surface of the die; if the hoist had been working properly, the twenty inch descent would have taken several minutes and Carlson would have had ample time to complete this task. Instead the piston fell the entire twenty inches to the die and landed on plaintiff's left thumb and his right thumb, index finger, and middle finger. All these

eventually had to be amputated in major part.

The piston was removed from Carlson's hand by the overhead crane. That this could be done ruled out the possibilities that the accident was caused by some defect in the attachment of the load chain to the piston or in the crane itself. Examination of the hoist revealed that the load chain was entirely paid out; what had fallen was the load chain and the attached load. It was undisputed that if the hoist had been functioning properly, the operator could not have caused the abrupt fall by improper manipulation of the chain.

The record is not altogether clear as to what happened next. Defendant read in evidence a deposition by Green, construction superintendent for the Austin Company, in which Green said that, having first ordered an ambulance from his office, he arrived at the scene of the accident three to five minutes after its occurrence; that the piston was still hooked to the hoist—"Whether the piston was up or down I wouldn't say"; that he operated the hoist to raise and lower the piston, which it did successfully; and that he then had the hoist taken to his office where it remained for three or four days until he sent it out for testing. Plaintiff's witness Merriman, the signalman of the crew, testified that, after having arranged for the crane to remove the piston from Carlson's hands, he ran down to see Carlson, then busied himself looking for the ambulance, and, when he next saw the hoist, 10 or 15 minutes after the accident, found it lying on the ground, disassembled, with Cannon, the Austin Company's general foreman, and Griffith, the night foreman, standing over it and with Cannon holding a friction disc. This disc bore some black marks, which Merriman termed "a heat or what we call in our trade a guald mark," caused by "intense friction or heating being applied." Clearly Merriman's and Green's testimony cannot be wholly reconciled.

Having sought to negate all causes of the accident other than a defect in the hoist, plaintiff endeavored to indicate what the defect might have been. Merriman was allowed to testify, over an objection which we will discuss below, that if the elastic nut which held the hand wheel on the central shaft of the hoist were loose, the two friction discs would not hold the full capacity of the load, and that he had seen other hoists in which a cotter pin had been inserted behind the nut to prevent such slippage. Stewart, a consulting engineer, corroborated this. In addition, he had examined the friction discs and found that each showed heavy black circles of a resinous material; this, he said, was the result of the release of a bonding agent induced by heat generated by friction, "a dynamic type of braking operation * * * indicative of the development of a brake fade situation" which would cause slippage. Stewart also advanced an alternative theory. On the basis of examination of the braking mechanism of another hoist of the same model, he concluded there was a possible defect in the ratchet, a circular wheel having teeth, and in the pawl, a tongue-like strip that fitted into the teeth. When the hand wheel was turning in the up direction, he detected a tendency for the tip of the pawl not to slip into one of the teeth but rather to get hung up on the end of the wheel. He said that then the heavy downward pressure of the load would cause the ratchet to reverse itself and begin to move rapidly in the other direction and that the friction discs, designed for static braking, might be insufficient for such a dynamic braking situation.

In addition to the deposition of Green as to his successful operation of the hoist immediately after the accident, defendant's case was as follows: Shilstone, the engineer to whom Green sent the hoist for testing, described extensive operating tests he had made and said that at no time did the hoist malfunction in any degree. Cotesworth, defendant's service manager, testified that the hoist was received back from Texas in December, 1950; that he examined it in April, 1951; that the hoist operated properly;

that he opened the hoist and found it "in good condition," although what he called "the washers," which we take to be what other witnesses called the friction discs, "were encrusted with black scale and showed uneven braking surfaces." Defendant sought to counter plaintiff's evidence with respect to the nut by testimony of its chief engineer that if a substantial amount of weight was on the load chain, the hand wheel would be forced against the friction discs regardless of how loose the nut was; this was corroborated by tests run by another engineer in defendant's employ. The chief engineer also testified that the type of elastic nut which defendant employed was in standard use, and that the small size of the shaft would make it difficult to install a cotter pin of adequate size. The same witness sought to counter Stewart's ratchet and pawl theory on the basis that the ratchet and pawl are part of the operative mechanism only when the load is being raised rather than lowered; however, the witness conceded on cross-examination that safe operation demanded that the ratchet be stationary on the downward pull, although he went on to say that if for some reason the pawl was not inserted in the ratchet at the beginning of the downward operation or had popped out, this still could not account for such malfunctioning as here occurred.

Defendant sought also to explain how the accident could have happened if there had been no defect in the hoist. It suggested that if the fastening at the upper end of the piston was not an eye but a hook (or an eye which had opened so as to be a hook)—a possible, though highly dubious, inference from some language in Merriman's testimony which he later disclaimed—this hook might have become entangled with the slack portion of the load chain, thereby transferring the weight and depriving the braking mechanism of any force, so that the load would drop as soon as the operator released the hand chain. However, cross-examination showed that the physical relationship between the fastening and the slack part of the load chain made such a transference impossible; and defendant has not seriously pressed this point on appeal.

At the end of plaintiff's case defendant moved to dismiss; the judge reserved decision. At the conclusion of the entire case defendant moved for a directed verdict and for dismissal of the negligence count; the judge again reserved decision. Later defendant moved to have the verdict set aside; this the judge denied.

■ On most matters we must here apply the law of New York, including, of course, its conflict of laws, Klaxon Co. v. Stentor Electric Manufacturing Co., Inc., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. New York would look to Texas law for all "substantive" rules. We are not required to decide whether the reference to New York law ought include the quantum of proof required to sustain a jury verdict, see Dick v. New York Life Ins. Co., 1959, 359 U.S. 437, 444, 445, 79 S.Ct. 921, 3 L.Ed.2d 935, or, if it ought, whether New York would look to its own rule or that of Texas, see American Law Institute, Restatement of the Conflict of Laws, § 595, comment b; Clark v. Harnischfeger Sales Corp., 2d Dept. 1933, 238 App.Div. 493, 264 N.Y.S. 873; Anderson v. Material Co-ordinating Agency, Inc., Sup.1946, 63 N.Y.S.2d 324; Franklin Sugar Refining Co. v. Lipowicz, 4th Dept. 1927, 220 App.Div. 160, 165, 221 N.Y.S. 11, 15, affirmed 1928, 247 N.Y. 465, 160 N.E. 916, 59 A.L.R. 1414. For the parties have not urged and our own study has not indicated that, in cases like the present, any different test of sufficiency is applied by the Federal courts, the New York courts or the courts of Texas.

■ Analysis is aided by recognizing that plaintiff had two separate problems of proof. He was obliged to show, *first*, that his injury was caused by a defect in the hoist, and, *second*, that the defect was attributable to defendant's negligence. See the useful discussion in 2 Harper & James, The Law of Torts, §§ 28.12 and 28.14. Clearly plaintiff pre-

sented sufficient evidence to meet his burden on the first proposition. "The plaintiff was not required to offer evidence which positively excluded every other possible cause of the accident," Rosenberg v. Schwartz, 1932, 260 N.Y. 162, 166, 183 N.E. 282, 283, although, in fact, Carlson came close to doing so. If the evidence did not utterly exclude maltreatment of the hoist after it had left defendant's factory, improper fixation of the hoist to the crane, faulty manipulation by the hoist operator, malfunctioning of the crane, or a defect in the eyebolt or its attachment, there was at least a vast preponderance in plaintiff's favor. To be sure, there was also the testimony of Green, Shilstone and Cotesworth as to the proper functioning of the hoist after the accident. However, the jury was not required to believe Green, whose testimony was inconsistent with Merriman's in some respects and whose story that he then and there manipulated a heavy piston with a hoist that had just given way might well have seemed improbable; the value of Shilstone's tests was impaired by Merriman's testimony that the hoist had been disassembled and, presumably, reassembled on the spot, so that a defect in assembly might have been cured; and Cotesworth's inspection, nine months after the event, was still less conclusive.

Plaintiff's success in overcoming the first hurdle does not relieve him of the need of surmounting the second, although it may help him as we shall see. On the second proposition plaintiff's evidence was admittedly meagre; indeed, defendant says it was non-existent. Plaintiff says it sufficed to meet the limited requirements made of him, citing Trowbridge v. Abrasive Co. of Philadelphia, 3 Cir., 1951, 190 F.2d 825, and Markel v. Spencer, 4th Dept. 1958, 5 A. D.2d 400, 171 N.Y.S.2d 770, affirmed without opinion, 1959, 5 N.Y.2d 958, 184 N.Y.S.2d 835, 157 N.E.2d 713.[1] Defendant seeks to distinguish these cases on the basis that in both the defect had been particularized, disintegration of an abrasive wheel in one case and shattering of a bolt in an automobile brake in the other, whereas here there was no clear proof of any specific defect in its hoist—there being no direct evidence that the nut on this hoist was loose or the ratchet and pawl defective, in addition to defendant's claim that these could not have caused the accident in any event.

Defendant's attempted distinction would elevate an element of proof into a principle of law. To be sure, in many cases pinpointing the defect will make it easier for a plaintiff to adduce other evidence to support a finding of negligence in manufacture, as in the Abrasive Co. case, which is indeed distinguishable on the existence of more impressive expert testimony of this sort. On the other hand, it is hard to see how the evidence as to the shattering of the bolt in the automobile brake in Markel took the plaintiff very far down the road—if such an expression is permissible on the facts there—since plaintiff offered no proof that what caused the shattering was due to defect in design or in the selection of materials or was within defendant's power to detect by any reasonable means of inspection, and the court added that "even if it were found that the defendant had purchased the bolt from others, the inference of negligence on its part was nevertheless a permissible one." It has been said, 2 Harper & James, The Law of Torts, p. 1568, that "Where there is no evidence of a specific defect, dangerous and unusual performance by an article subjected to ordinary use is sometimes held to warrant an inference of the maker's negligence as well as of a defect, if other likely explanations of the mishap are ruled out by a preponderance of the evidence." For this the authors cite, in addition to a line of "bursting bottle" cases, Trowbridge v. Abrasive Co., supra; Lindroth v. Wal-

---

1. Plaintiff also cites Swensson v. New York, Albany Despatch Co., 1956, 309 N.Y. 497, 131 N.E.2d 902, but we do not find that decision, dealing with a reconditioner, of much aid.

green Co., 1950, 407 Ill. 121, 94 N.E.2d 847; and Carter v. Yardley & Co., 1946, 319 Mass. 92, 64 N.E.2d 693, 700, 164 A.L.R. 559. The Abrasive Co. case hardly supports this for the reason pointed out above; and in the Yardley case the evidence of negligence went somewhat beyond the mere fact of injury to the plaintiff and the question mainly preoccupying the Supreme Judicial Court was its important decision that MacPherson v. Buick Motor Co., 1916, 217 N. Y. 382, 111 N.E. 1050, L.R.A.1916F, 696, had "caused the exception to swallow the asserted general rule of nonliability" of manufacturers to persons not in privity of contract with them. However, Lindroth and the bursting bottle cases support the quoted proposition, as does Markel v. Spencer, supra,[2] and the law seems to be moving that way. Here we do not have to go quite so far in order to sustain the verdict. Plaintiff demonstrated that undue friction and consequent slippage had occurred within the hoist and suggested two possible reasons why— slippage of the nut, permitting an inference that this had been ill designed or installed, and defect in the ratchet and pawl, permitting an inference of negligence in design, choice of materials or inspection; and the jury could properly have believed plaintiff's rather than defendant's witnesses as to the causal relation of these alleged defects to the accident.

■ It remains to consider defendant's points as to the admission of certain testimony. Merriman was asked his opinion as to the cause of the accident, and over the defendant's objection, gave the following answer:

"In my opinion if this nut had been loose on the chain wheel, and this hoist had slacked in, the two friction discs would not hold the full capacity of this load. It would slip. It would turn loose."

Defense counsel moved to strike the answer; the motion was denied. Then the witness was asked, "In your opinion, Mr. Merriman, was that nut loose at the time of the accident"; defense counsel objected to the question as speculative and the objection was sustained. Insofar as defendant's objection and motion to strike were based on a theory that the testimony was irrelevant in the absence of evidence that the nut in fact was loose, they were properly overruled; particularly when a plaintiff is claiming a defect in an article manufactured by defendant and under defendant's control at the time of trial, plaintiff may show possible as well as actual defects. However, this does not end the matter, for defendant cites New York decisions strictly limiting expert witnesses in expressing opinions regarding the causes of accidents. An example is Dougherty v. Milliken, 1900, 163 N.Y. 527, 57 N.E. 757, where it was held to be reversible error for the trial court to permit answer to a hypothetical question regarding the safety of a certain construction used to anchor two derricks; the plaintiff's theory of the case was that the defendant was negligent in using that construction, and the court held that expert opinion on the very question the jury had to resolve impinged on the jury's prerogatives. Accord, Welz v. Commercial Travelers Mutual Accident Ass'n, 2d Dept. 1943, 266 App.Div. 668, 40 N.Y.S. 2d 128; Blind v. Rochester Aeronautical Corp., 4th Dept. 1948, 273 App.Div. 1056, 79 N.Y.S.2d 799. Although earlier New York cases, not overruled or criticized, Van Wycklen v. City of Brooklyn, 1890,

2. The authors shrewdly suggest, p. 1568, fn. 27, that these decisions may amount to an unstated application of *res ipsa loquitur*, unstated because it offends Chief Justice Erle's mandate, Scott v. London & St. K. Docks Co., 3 H & C 596, 601, 159 Eng.Rep. 665 (1865), that "the thing" must be "shewn to be under the management of the defendant and his servants" at the time of the injury, but nevertheless sound once plaintiff has established that the defect must have existed when "the thing" left defendant's control. See also § 19.7, pp. 1085 ff.; Benkendorfer v. Garrett, Tex.Civ.App. 1940, 143 S.W.2d 1020; Honea v. Coca Cola Bottling Co., 1944, 143 Tex. 272, 183 S.W.2d 968, 160 A.L.R. 1445.

118 N.Y. 424, 429, 24 N.E. 179, and Littlejohn v. Shaw, 1899, 159 N.Y. 188, 193, 53 N.E. 810, both citing Transportation Line v. Hope, infra, seem to have looked the other way, we need not explore the New York law in detail, for the testimony was admissible in the District Court under the second clause of Fed.R.Civ.Proc. 43(a), 28 U.S.C.A. which provides:

> "All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held."

See Phelan v. Middle States Oil Co., 2 Cir., 220 F.2d 593, 605, certiorari denied Cohen v. Glass, 349 U.S. 929, 75 S.Ct. 772, 99 L.Ed. 1260.

An 1877 decision of the Supreme Court in admiralty, Transportation Line v. Hope, 95 U.S. 297, 24 L.Ed. 477, firmly rejected the view that experts may not express an opinion on the ultimate issue for the jury. The Court held that an expert in navigation might testify whether it was "safe or prudent" to tow boats in a particular way. While the rule of Transportation Line v. Hope was frequently applied in the Federal courts prior to the adoption of the Federal rules, see, e. g., Fireman's Ins. Co. of Baltimore v. J. H. Mohlman Co., 2 Cir., 1898, 91 F. 85; Western Coal & Mining Co. v. Berberich, 8 Cir., 1899, 94 F. 329; cf. United States v. Spaulding, 1935, 293 U.S. 498, 506, 55 S.Ct. 273, 79 L.Ed. 617; we have not found any decision of a Federal equity court on the point. However, in view of the Supreme Court's long standing adherence to the Transportation Line decision, we think this is a case for assuming, in accord either with the maxim, *aequitas sequitur legem,* or with just ordinary good sense, see Green, The Admissibility of Evidence Under the Federal Rules, 55 Harv.L.Rev. 197, 201–02 (1941), that a well established Federal rule of evidence was applied on the equity side as well as on the law side even though no equity decision so declares. See also, Wigmore, Evidence, 3d ed., §§ 1920 and 1921, condemning the exclusionary rule.

■ Defendant also contends that Stewart should not have been permitted to testify on his "ratchet and pawl" theory since this was derived from examination of a Chisholm-Moore hoist other than the one involved in the accident. The plaintiff denies an intention to allege that any particular ratchet and pawl was defective; however, the district judge seemed to have received a different impression, for in his summary of the evidence, he referred to the plaintiff's contention "that the materials of the pawl mechanism were defective." Perhaps the difference is only semantic. Stewart was testifying that in a similar hoist he had found a ratchet and pawl which, in his view, did not function properly; from this the jury could infer that the same malfunctioning occurred in the accused hoist. We see nothing wrong in this; Stewart's testimony would have been entitled to more weight if he had found malfunction in the hoist that failed, but the testimony was not inadmissible because he had found the defect only in another of defendant's hoists of similar design. See Lever Bros. Co. v. Atlas Assurance Co., 7 Cir., 1942, 131 F.2d 770, 777.

Judgment affirmed.