Frank King, Plaintiff-Appellee, v. Mid-State Freight Lines, Inc., A. O. Schoen, and John Clarke, Administrator of Estate of Lyle Clarke, d/b/a Clarke Outdoor Spraying Company, Defendants. John Clarke, Appellant.

**Gen. No. 10,809.**

Second District.

May 19, 1955.

Released for publication June 8, 1955.

Robert L. Brody, George L. Gore, and Edwin Farrar, all of Chicago, for appellant; Charles D. Snewind, of Chicago, of counsel.

O'Brien, Burnell & Puckett, of Aurora, for appellee; William C. O'Brien, Wilson D. Burnell, Donald L. Puckett, and Joseph H. Barnett, all of Aurora, of counsel.

MR. JUSTICE CROW delivered the opinion of the court.

This is a suit resulting in a verdict by a jury in favor of the plaintiff and against the defendant John Clarke, administrator of the estate of Lyle Clarke, d/b/a Clarke Outdoor Spraying Company, and a judgment entered thereon assessing the plaintiff's damages at the sum of $10,000 for certain personal injuries allegedly suffered by the plaintiff as the result of the decedent Lyle Clarke's negligence. The other original codefendants, Mid-State Freight Lines, Inc. and A. O. Schoen were found not guilty by the verdict and the plaintiff has not appealed from that. The complaint contained counts alleging negligence and counts alleging wilful and wanton conduct. The motions of the defendants for directed verdicts at the close of the plaintiff's evidence and at the close of all the evidence were denied as to the counts alleging negligence and were allowed as to the counts alleging wilful and wanton conduct. The defendant John Clarke, administrator, filed a motion for judgment for that defendant notwithstanding the verdict. He did not file a motion for new trial. The trial court denied the defendant's motion for judgment notwithstanding the verdict and this is an appeal from that order and the judgment entered.

 The question presented by the appeal, therefore, is the rather narrow issue of whether there is any competent evidence, together with all reasonable inferences to be drawn therefrom, standing alone, taken with all its intendments most favorable to the plaintiff, tending to prove the material elements of the plaintiff's case and from which the jury might reason-

162

ably find for the plaintiff and against that defendant to the effect that the plaintiff, while free from contributory negligence, was injured as a direct and proximate result of the negligence of the decedent Lyle Clarke; on this record we are not concerned with the weight or credibility of the evidence; reasonable inferences may be drawn by a jury from established facts, and a verdict may not be set aside merely because the jury could have drawn different inferences from the evidence; only where there is a complete absence of probative facts to support the conclusion drawn by the jury is it reversible error to overrule a motion for judgment notwithstanding the verdict: Lindroth v. Walgreen Co. et al. (1950) 407 Ill. 121. The principles applicable on such a motion are the same as are applicable on a motion for a directed verdict, and are well settled: Neering v. Illinois Cent. R. Co. (1943) 383 Ill. 366.

At about 2:15 a. m., August 23, 1952, the plaintiff was injured while riding as a passenger in the right front seat of an automobile driven by one Roland Stinson, on U. S. Route 34, also known as Ogden avenue, in a southwesterly direction about ½ mile east of Route 83 and a short way north of the north boundary of Hinsdale, Illinois. Ogden avenue is a 4-lane, heavily travelled, arterial highway passing through Hinsdale in a northeast to southwest direction. The terrain is rolling. The automobile of Stinson collided with the rear of a truck owned and operated by the Mid-State Freight Lines, Inc., of which A. O. Schoen was the driver, then also being driven in a southwesterly direction on Ogden avenue. The point on Ogden avenue where this incident occurred is between Adams and Monroe streets, which are 2 north-south streets running into Ogden avenue. That point and Ogden avenue generally for apparently 1½ to 2 blocks east and about the same distance west of the point is outside the village limits of Hinsdale. But about 1½ blocks east of

163

the point of this occurrence the village boundary line jogs across Ogden avenue and extends north for several blocks and extends east along Ogden avenue some distance. So that, beginning about 1½ blocks east of the point of this occurrence Ogden avenue is for some distance entirely within Hinsdale and Hinsdale there extends northwardly from Ogden avenue for several blocks. And west or southwest of the point of this occurrence Ogden avenue, running diagonally southwestwardly, comes closer and closer to the village limits of Hinsdale, finally forms the north boundary thereof for something more than 2 blocks, and ultimately intersects Route 83 at the northwest corner of the village, Route 83 running north and south and being the west boundary of the village. Ogden avenue at Adams street near the scene of the accident, is about 300 feet north of the village limits. North street is the first through street in the village south of Ogden avenue, it runs east-west, and, topographically, the intersection of North street and Monroe is the highest point in the village, and the point on Ogden avenue where this incident occurred is 20 or 25 feet lower. The area south of Ogden avenue between Monroe and Adams streets and north of North street is vacant, is part of an old "peat bog" and "slough," and is surrounded by higher terrain on all sides to form a natural bowl at Ogden avenue and Monroe, about ½ block from the point of this accident on Ogden. That immediate area south of Ogden avenue is brush and weeds. North of Ogden is low land and some trees.

The plaintiff, in substance, alleged that Lyle Clarke, the defendant's intestate, then doing business as Clarke Outdoor Spraying Company, had contracted with Hinsdale to spray the village with mosquito control fog from time to time during the summer of 1952 as the need might arise; that Clarke so conducted such fogging operation at the times in question—during the night of August 22, 1952 and the early morning of

164

August 23rd, by spraying certain areas of the village; that he had sprayed certain areas both north and south of Ogden avenue near the vicinity of the collision; that the mode of operation of Clarke was to travel along the streets with a motorized spray apparatus, releasing a chemical fog to destroy mosquitoes and other insects; that Clarke depended on the force of the wind to carry this chemically created and saturated fog from the street to areas beyond the curbs, and that at the times in question large patches of such fog were created and blown over and upon Ogden avenue; that the truck of Mid-State Freight Lines, Inc. encountered one of these patches of created mosquito control fog and stopped or nearly stopped therein creating a special hazard to persons lawfully travelling on the highway; that due to the alleged negligence of Clarke the automobile of Stinson, in which the plaintiff was riding, collided with the rear of the Mid-State Freight Lines, Inc. truck, which was so stopped or nearly stopped in such patch of created mosquito control fog, and as a direct and proximate result of Clarke's negligence and the ensuing collision the plaintiff was injured by being thrown in and about the automobile in which he was riding.

The charges of negligence are: (1) Clarke negligently and improperly carried on his spraying operation; (2) Clarke negligently failed to display warning signs of the hazardous situation which he knew or should have known would be created by his operation; (3) Clarke negligently carried on his spraying operation at a point so close to Ogden avenue as to endanger persons lawfully traversing the same, and (4) Clarke negligently carried on his spraying operation at a time when he knew or should have known the wind would carry the fog so created over and upon the highway, obstructing and impairing the vision of persons lawfully traversing the same.

165

The evidence, viewed in the light and in the manner in which it must be viewed for the purposes of this appeal on the limited issue presented, indicates that Clarke was operating the Clarke Outdoor Spraying Company business and on August 22, 1952 had 2 motorized spray generator units in use in Hinsdale, 1 operated by William Bonow, and the other by John Husa, Clarke's employees. The trucks went up and down each street very slowly, 3–5 m. p. h., and released the mosquito control fog in and at right angles to the wind until the entire village had been covered. The wind was utilized to distribute it over an area, a light wind carrying the fog approximately 300 feet for effective coverage. Wind direction determines whether north-south or east-west streets are used. The fog was white in color and was emitted at the rear of the machine; it was just like a rolling white fog and rolled toward the center of a block and then dissipated rapidly. On cool ground it would tend to stay down for about 100 feet or so and then it gradually billowed up 25 or 30 feet and disappeared, with a little tendency to settle in a depression. If the wind shifted and blew it back toward the truck from which it was being generated the fog would cut down the visibility of the operator. One in the fog cannot see at all for an instant when the full force of the fog hits. The generator trucks had red flasher signals on top to warn people on the highways. The fog is emitted from one side of the truck at the rear from a nozzle close to the curb and at the curb furthest away from the wind. The fog contains fuel oil and DDT, which has a recognized odor. The odor of the fog, which persists from 5 to 6 hours, can be readily recognized, for it smells like any petroleum product. The fog appears white to the vision and is comparable in color to an actual natural fog. The density of the fog varies when it is diluted with air. The fogging operation is done at night, for most effective operation, because then things cool off and the fog

166

stays close to the ground. Latent heat in a surfaced street or road causes the fog to lift. The velocity of the wind and the temperature of the ground have something to do with the time in which the fog dissipates. It ordinarily disappears within 2 or 3 minutes but sometimes not for 30 minutes after spraying or being emitted from the machine. Some droplets making up the fog remain in the air for as much as 5 or 6 hours afterwards.

John Husa, operator of one of Clarke's trucks on the night in question, testified that he was spraying the streets in Hinsdale on the night of August 22nd and early morning of August 23rd, beginning about 7:00 p. m.–7:30 p. m. He divided the area to be sprayed with William Bonow, operator of the other truck. No one gave any definite orders. It was his first spraying operation in Hinsdale. Husa and Bonow had been supplied with maps of the village. Husa took the area south of the Burlington R. R. tracks (which pass diagonally through Hinsdale in a northeast-southwest direction about 7 blocks south of Ogden avenue), and Husa drove down the streets that run east and west, across the then prevailing direction of the wind at that time. No warning signs or any indication of spraying operations were put out or displayed that night. At about 2:30 a. m., August 23rd, after Husa and Bonow had finished their job, Husa arrived in his truck at the corner of York road and Ogden avenue, a short distance west of the point of the accident, and met Bonow, the other driver, there, when and where they both then heard a police ambulance going to the scene of the accident.

William Bonow, the operator of the other fog generating truck, began operations about 7:00–7:30 p. m.; he testified to the effect that he did not know exactly which streets he had operated upon that night; he did not know what street he finished up on that night; that he could not be sure of the general section; that he had

167

no recollection of where he was between 2:00 and 2:15 a. m.; that at 2:30 or 3:00 a. m. at York and Ogden the spraying was finished; the entire north half of the village was done; on and north of Ogden avenue (presumably within the village limits) and from Ogden avenue to North street between Route 83 on the west and Vine street (a north-south street 2½ blocks, about, east of the point where the accident occurred) fogging was carried on, as well as around the edges of the area bounded by Ogden, North, Adams, and Monroe (the so-called old peat bog and slough region). He could not remember from what direction he approached the York road-Ogden avenue meeting place with Husa after the operations were finished. He could have approached it from York or Ogden avenue.

Oscar Hein, a police officer of Hinsdale, on the night in question, was aware that it was being sprayed for mosquitoes. He had occasion to investigate the accident in the early morning of August 23rd, on Ogden avenue. He drove southwesterly on Ogden avenue from a point east of the scene of the accident, and on his way to the scene of the accident he noticed a fog and ran through two spots of it. He could not recall the streets where those spots were; it cut down his visibility. After going through those patches of fog he proceeded to the scene of the accident on Ogden avenue between Monroe and Adams street, somewhat north of the village limits of Hinsdale. The accident there involved two vehicles, one belonging to Mid-State Freight Lines, Inc. and the other belonging to Roland Stinson. Hein said he had occasion to smell the mosquito control fog and that such smell was present at the scene of the accident, but no fog was there when he arrived. The odor, he says, lasts much longer than the fog.

Joseph Dawson, another police office of Hinsdale, also investigated the accident with Hein. Dawson says there was no fog at the scene of the accident when he arrived, but he could smell a mosquito fog. He had

168

gone up and down the streets of Hinsdale that night and had both smelled and seen the fog at different times.

Roland Stinson, a witness for the plaintiff, said that he was driving his 1947 Pontiac with the plaintiff, King, in the front seat with him. He had stopped to eat at some place on Ogden avenue, and then started home, travelled 4 or 5 miles, and then all at once ran into a fog, which was right on him before he saw it, and he was blinded. He started to apply his brakes; the plaintiff said something to him about the fog blinding him, and Stinson was then applying the brakes; then at that time he hit the rear of the truck in front; he saw nothing but the fog, no lights; the fog cleared up some after the accident; Stinson said he was going 25 to 30 miles per hour prior to the accident; he had not seen any indication of a fog until immediately prior thereto; he saw no warning signs indicating anyone was then and there spraying for mosquitoes.

A. O. Schoen, the driver of the Mid-State Freight Lines, Inc. truck, said that he had been travelling about 25 miles per hour; had been going downhill when the fog first appeared; he said the fog was gray to grayish-white in color; it seemed to be coming from the south side of the road across to the north side and coming from the direction of certain high weeds; behind the high weeds south of Ogden avenue there are no improvements for a way; he said there was no moisture observable on the windshield of the truck he was driving. The fog seemed to be moving northerly into the woods to the north of Ogden avenue; it was a clear moonlight night and warm; the windows of the truck he was driving were open; when in the fog he could see to the end of the trailer part of his truck and approximately 15 feet beyond; he could see Stinson's headlights about 50 feet behind the truck he was driving; when Schoen entered the fog he took his foot off of the accelerator and applied

the brakes, slowed down to about 10 miles per hour and continued at 10 miles per hour until this occurrence; as he got out of the truck after the accident the fog lifted and he then saw no fog in any direction.

The defendant raises the following points: (1) there is no competent evidence and no inferences reasonably to be drawn from the evidence to support the judgment; (2) the fog was not a "mosquito fog," was not created by Clarke, but was of natural origin; (3) Clarke was not guilty of actionable negligence; (4) any "mosquito fog" was not the proximate cause of the occurrence; and (5) the plaintiff was guilty of contributory negligence as a matter of law.

We believe there is competent evidence, together with all reasonable inferences to be drawn therefrom, standing alone, taken with all its intendments most favorable to the plaintiff tending to prove that Stinson, in whose car the plaintiff was riding, drove his car into a created mosquito fog created at the time and place in question by Clarke in his mosquito control operation, which obscured his vision, and which proximately caused the injuries to the plaintiff when Stinson struck the rear of the truck ahead, as opposed to the contradictory theory advanced by the defendant that the fog there was of natural origin and not caused by Clarke's operation, particularly where it is shown, as here, that on the night of August 22nd and the morning of August 23rd, Clarke in fact fogged the total area of Hinsdale, including the general area where the incident occurred; the fog there had many of the characteristics of a mosquito control fog, including color, density, settling in a depression, fairly rapid dispersal, and odor, as observed at the time of the incident; the two fogging trucks at about 2:30 a. m., about the time of the accident, were not far from the scene of the accident; the fogging operations were carried on very slowly; the spraying operation by Bonow was completed about 2:30 a. m., but Bonow

could not tell exactly where the completion occurred, or on what streets he travelled with the fogging truck that night, or where he was between 2:00 and 2:15 a. m.; the terrain on Ogden avenue at the point in question is rolling; the point where the accident occurred is only a short way from the limits of Hinsdale in 3 different directions; that point is only about a block from the highest point, topographically, in the village; the point of the accident is 20–25 feet lower than that highest point; the place of the accident is adjacent to an old peat bog and slough, and in the midst of a natural bowl surrounded by higher ground; that the fog seemed to move from south to north across Ogden avenue, indicating that the prevailing wind at the time in question was from the south; and that a mosquito fog sometimes does not disappear for 30 minutes after spraying.

The trial judge on 3 separate occasions,—on the defendant's motion for a directed verdict at the close of the plaintiff's evidence, on the same motion at the close of all the evidence, and on this motion for judgment notwithstanding the verdict,—having an opportunity, which we do not, to observe the witnesses, their conduct, and demeanor, as well as their testimony,—having considered those questions, concluded there was evidence to support the plaintiff's case, and we are not disposed to disagree with his conclusion, in view of the facts disclosed by the record. There is an evidentiary basis for the jury's verdict, there is no complete absence of probative facts, and the jury was free to disregard or disbelieve alleged facts inconsistent with their conclusion, and all that is reasonably required to establish controverted facts is that the evidence creates a greater or lesser probability, leading, on the whole to a satisfactory conclusion: Lindroth v. Walgreen Co. et al., supra; Town of Cicero et al. v. Industrial Commission (1949) 404 Ill. 487; Devine v. Delano et al. (1916) 272 Ill. 166.

171

The fact that there is or may be some evidence that might have been a reasonable basis for inference by the jury that the fog at the time and place in question was of natural origin is beside the point on the present record,—the inquiry here is whether the inference and result reached by the jury is one which is reasonable on the facts in evidence, not whether some other inference or conclusion might also have been reached: Lindroth v. Walgreen Co. et al., supra. As the Supreme Court of the United States said in Lavender v. Kurn et al. (1945) 327 U. S. 645, 90 L. Ed. 916, at pp. 922–923—

"It is true that there is evidence tending to show that it was physically and mathematically impossible for the hook to strike Haney. And there are facts from which it might reasonably be inferred that Haney was murdered. But such evidence has become irrelevant upon appeal, there being a reasonable basis in the record for inferring that the hook struck Haney. The jury having made that inference, the respondents were not free to relitigate the factual dispute in a reviewing court. Under these circumstances it would be an undue invasion of the jury's historic function for an appellate court to weigh the conflicting evidence, judge the credibility of witnesses and arrive at a conclusion opposite from the one reached by the jury. See Tiller v. Atlantic Coast Line R. Co. 318 US 54, 67, 68, 87 L ed 610, 617, 618, 63 S Ct 444, 143 ALR 967; Bailey v. Central Vermont R. Co. 319 US 350, 353, 354, 87 L ed 1444, 1447, 1448, 63 S Ct 1062; Tennant v. Peoria & P. U. R. Co. 321 US 29, 35, 88 L ed 520, 525, 64 S Ct 409, 15 NCCA (NS) 647. See also Moore, 'Recent Trends in Judicial Interpretation in Railroad Cases under the Federal Employers' Liability Act,' 29 Marquette L. Rev 73.

"It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of

172

speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable."

Neither the defendant nor the plaintiff have cited to us any Illinois cases directly in point on their facts bearing on the legal questions of the defendant's duty, negligence, proximate cause, and the plaintiff's contributory negligence in such a situation as this. The general principles, however, are well settled, and the cases generally are legion. We think Wintersteen v. National Cooperage & Woodenware Co. (1935) 361 Ill. 95, and Neering v. Illinois Cent. R. Co. (1943) 383 Ill. 366 are representative.

In Wintersteen v. National Cooperage & Woodenware Co., supra, the court said, at pp. 103, 104, and 105:

". . . It is axiomatic that every person owes a duty to all persons to exercise ordinary care to guard against any injury which may naturally flow as a reasonably probable and foreseeable consequence of his act, and the law is presumed to furnish a remedy for the redress of every.wrong. This does not depend upon contract, privity of interest or the proximity of relationship between the parties. It extends to remote and unknown persons. Colbert v. Holland Furnace Co. 333 Ill. 78; Baird v. Shipman, 132 Ill. 16.

". . . It is difficult to write a general rule by reason of the complex and diversified circumstances arising daily in the modern industrial and business world

173

defining a situation in which the causal connection is broken so as to release the party guilty of negligence in the first instance from liability for the injury suffered by another. It may be stated as a general rule that in order to render the party liable for his negligent act such act must be so related to the injury as to be the proximate cause thereof. The intervention of independent, concurrent or intervening forces will not break the causal connection if the intervention of such independent force was itself probable and foreseeable. (Sullivan v. Ohlhaver Co. 291 Ill. 359; Miller v. Kelly Coal Co. 239 Ill. 626.) Tested by this rule, the facts here fail to show, as a matter of law, the interruption of the causal connection, or that the dunnaging of the car with defective materials or in an improper manner was not the proximate cause of the plaintiff's injuries. Such issue was a question for the jury. (Illinois Southern Railway Co. v. Hamill, 226 Ill. 88.)

". . . If a reasonably prudent person might, and ordinarily would, foresee that the omission to do a certain act or the commission of an act in a certain way would likely result in injury to another, and injury to another does follow as a result thereof, such act of omission or commission is negligence and the proximate cause of the injury. (1 Thompson on Negligence, sec. 50.)"

██ In Neering v. Illinois Cent. R. Co., supra, the court said, at pp. 380–381:

"Defendant further contends that even though it had been guilty of negligence on the occasion in question, the criminal act of the colored man was an intervening cause and defendant's negligence was not the proximate cause of plaintiff's injury and that the abnormal criminal act of the third person broke the chain of causation. It cannot be denied that if the negligence of the defendant only furnishes a condition and that condition causes an injury by the subsequent inde-

174

pendent act of a third person, the creation of the condition is not the proximate cause of an injury. However, the rule is that the subsequent independent act, in order to break the causal connection, must be one, the intervention of which was not probable or foreseeable by the first wrongdoer. What constitutes proximate cause has been defined in numerous decisions, and there is practically no difference of opinion as to what the rule is. The injury must be the natural and probable result of the negligent act or omission and be of such a character as an ordinarily prudent person ought to have foreseen as likely to occur as a result of the negligence, although it is not essential that the person charged with negligence should have foreseen the precise injury which resulted from his act. (Illinois Central Railroad Co. v. Oswald, 338 Ill. 270; Hartnett v. Boston Store of Chicago, 265 Ill. 331.) An intervening efficient cause is a new and independent force which breaks the causal connection between the original wrong and the injury and itself becomes the direct and immediate cause of the injury. (Illinois Central Railroad Co. v. Oswald, 338 Ill. 270; Pullman Palace Car Co. v. Laack, 143 Ill. 242.) The intervention of independent concurrent or intervening forces will not break causal connection if the intervention of such forces was itself probable or foreseeable. (Wintersteen v. National Cooperage and Woodenware Co., 361 Ill. 95; Sycamore Preserve Works v. Chicago and Northwestern Railroad Co., 366 Ill. 11.) What is the proximate cause of an injury is ordinarily a question of fact to be determined by a jury from a consideration of all of the evidence. Phillabaum v. Lake Erie and Western Railroad, 315 Ill. 131.

"The rule that the causal connection between a person's negligence and an injury is broken by the intervention of a new, independent, efficient and intervening cause so that the negligence is not actionable is subject to the qualification that if the intervening

175

cause was foreseen or reasonably might have been foreseen by the wrongdoer, his negligence may be considered the proximate cause of the injury and he may be held liable notwithstanding the intervening cause. The intervening act of a third person does not necessarily relieve the author of an earlier negligent or wrongful act from responsibility when the intervening cause of an injury is of such nature as could reasonably have been anticipated, in which case the earlier negligent act, if it contributed to the injuries, may be regarded as the proximate cause. Garibaldi & Cuneo v. O'Connor, 210 Ill. 284; Armour v. Golkowska, 202 Ill. 144."

 The jury could reasonably find from the evidence that the decedent Clarke created a mosquito control fog in the nighttime, at or near the scene of the accident, on or in close proximity to a well-travelled, arterial, public highway, knowing the fog would drift and was expected to drift with the wind, that it could and did, under some circumstances and for a time, limit and obscure vision, that the fog could last as long as 30 minutes, that wind direction, a factor the decedent knew he could not control, necessarily sometimes changes, and that the particular point on Ogden avenue involved is low, adjacent to an old peat bog and a slough, in the midst of a natural bowl where such a fog might well have a tendency to settle. Under these circumstances, Clarke was necessarily required to exercise the ordinary and reasonable care of a reasonably prudent man to prevent or guard against injury to a person in the position of the plaintiff lawfully travelling the public highway. We believe it follows from the competent evidence, and the reasonable inferences therefrom, that the jury could reasonably find that Clarke was, at the time and place concerned, not using that ordinary, reasonable care of a reasonably prudent person, for he made no effort to prevent or guard against injury to the plaintiff law-

176

fully travelling thereon, and the jury might reasonably find that Clarke could have reasonably foreseen the injuries to the plaintiff as a natural and probable consequence of his acts. He had a duty to exercise ordinary care to guard against an injury which might naturally flow as a reasonably probable and foreseeable consequence of his act. A reasonably prudent person, the jury could find, might and ordinarily would foresee that his omission to act or his commission of the act in a certain way would likely result in injury to parties on that highway, and injury having followed as a result thereof his act of omission or commission, the jury could find, is negligence and could be found by the jury to have been the proximate cause of the injury. Stinson's driving the car on the highway, and, his vision being obscured by the fog, his running into the rear of the truck which had slowed down because of the same fog, is not an intervention of an independent, concurrent, force, breaking the causal connection,—or, if it were, the jury could find that it was probable and foreseeable by the decedent Clarke.

■■■ On the question as to whether the plaintiff was in the exercise of due care and caution for his own safety or was guilty of contributory negligence as a matter of law, we believe this, too, was a question of fact for the jury, as it normally and pre-eminently is, upon which the plaintiff was entitled to have the finding of a jury: Lasko v. Meier et al. (1946) 394 Ill. 71. The plaintiff was riding with Stinson on a clear, moonlight night, in the front seat of a car travelling on a main arterial highway at a speed and in a manner the jury could say was reasonable. Stinson did not see the fog until he was in it. This was true also of Schoen, the driver of the truck, immediately ahead of Stinson. As Stinson entered the fog he applied his brakes, and the plaintiff contemporaneously cautioned Stinson about the fog. There is nothing to indicate

177

Stinson was generally an unsafe or reckless driver, or that his car was not in good mechanical condition, or that the plaintiff ought reasonably to have expected Stinson would not properly operate the car. The jury could reasonably find the plaintiff, under the circumstances, was not guilty of contributory negligence. We cannot say, as a matter of law, that all reasonable minds, in the exercise of a fair and honest judgment, would be compelled to reach the conclusion there was contributory negligence: Lasko v. Meier, supra. To do so would usurp the province of the jury.

We believe there was no error in denying the motion of the defendant for judgment notwithstanding the verdict or in entering the judgment for the plaintiff, and that judgment should be, and is hereby, affirmed.

Affirmed.

DOVE, J., concurs.

WOLFE, P. J., took no part.