RUDOLPH ZVONARITS, Plaintiff-Appellee, *v.* HARRY A. VOLLEN *et al.*, Defendants.—(CONSUMERS ROOFING AND INSULATING COMPANY, Defendant-Appellant.)

First District (4th Division)   No. 77-1388

Opinion filed September 14, 1978.

Robert W. Rooney, of Chicago, for appellant.

Edward J. Bradley, Jr., and Robert J. Tynan, both of Chicago, for appellee.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The defendant appeals from a jury verdict finding it negligently leaned a ladder against a railing while making roof repairs, thereby weakening the railing which later broke when plaintiff leaned against it. We find no error and affirm.

The plaintiff, Rudolph Zvonarits, worked as a janitor for Harry Vollen.[1] He did not work on Vollen's residential properties but at some other property. However, on the day of the accident, he went to Vollen's home at 3939 North Pine Grove in connection with his employment. While there, he noticed water coming from the ceiling and went upstairs to see if he could help.

The house at 3939 North Pine Grove is an old three story house built in 1899. There are outside wooden stairs in back going all the way up to the third floor. Besides the porch, the stairs have three landings. There are railings on both the stairs and the landings.

Zvonarits found a leak on the third floor. He had to tear a chest of drawers apart. While waiting for the plumber to come to repair the hot water line he decided to take the debris down. He walked out onto the stairs at the third-floor landing and walked down to the next landing. He looked at the railing which appeared all right to him, so he bent down, held on to the railing and called out that he was going to throw some debris. That is the last he remembered. Zvonarits was found lying on the ground directly below the landing and was rushed to the hospital.

Vollen observed that the top part of the railing on the second landing had given way. It had pulled out from both ends. The down slats were intact. Vollen had the entire railing replaced a few days later. In a deposition Vollen gave in 1975 he said it was the bottom part of the landing which had given way and not the top part.

According to Vollen, the railing was a horizontal two-by-four connected to vertical four-by-fours with slats running from the two-by-four. The two-by-four is grooved which allows for vertical slats to come

---

[1] Vollen was originally named as a defendant in this case but the claim was dismissed as barred by the Workmen's Compensation Statute.

down and tie into the floor of the particular landing. Vollen did not know what type of wood was used or how the nails were fastened. There is a locked metal gate on the rear steps of the back porch to prevent access to the stairs. The gate can be opened with a key from the outside or by turning a little round knob from the inside.

Vollen did not use the back stairs very often. The stairs and the railings were checked periodically—virtually every spring. There were some repairs done about a year prior to the accident but he did not remember what was repaired. He did not know if it had been 10 years since he had been on the third floor with repairs. He also stated that the railing had not been replaced before the accident. In a recorded statement made in 1971 he had said there had been no direct repairs to the railing within the last several years.

About five weeks before the accident, the defendant company was employed by Vollen to repair the roof. This work included laying asphalt shingles to cover the original tiles that were on the roof. When Vollen first saw the men at work, they had a wooden one-section ladder coming up from the ground level to the second landing which was the landing nearest the portion of the roof on which they were working. The top of the ladder extended about a foot and a half to two feet above the railing. He estimated that the railing was about 22 feet above the ground.

There were two men on the project. One appeared to be in his forties, another to be in his twenties. Both were light in weight, about 135-140 pounds. Vollen saw them climb the ladder perhaps two or three times. When the men reached the second landing they climbed around the top of the ladder and stepped down, the ladder being higher than the railing. They used a smaller ladder from the second landing to the roof—Vollen conceded, however, that he just assumed that they had a second ladder. He did not remember how they got materials to the roof. When the men climbed to the roof they stayed there for a full day or at least half of a working day before coming down.

Vollen believed that the work continued possibly for a whole week. As far as he could remember, the ladder was removed at the end of the day and replaced when work commenced the next day. On the second day that he observed the ladder it was replaced in the same manner.

At no time did Vollen tell the defendants that they should not lean a ladder against the railing. The roofer never asked him for a key to the metal gate barring access to the back stairs.

Three roofers who had worked on the job testified for the defense. Dan Dewaele testified that he had worked there approximately one half day, working on the main part of the flat part of the roof of the house. He got to the roof by setting a ladder on the side drive and worked off of a built-in gutter on the main part of the house. The ladder was not near the back

stairs or railings. The materials used on the roof were raised by double hoisting them. None of the material was carried up by ladder. At the time he worked on the job, there was no other crew for his company there and no other ladders. He was not there when the other crew had worked.

Frank Sayles had been part of the first crew which had worked on the roof. He is no longer employed by the defendant. He testified that he worked on the job at Pine Grove for about three days. On the first day, shortly after he and his partner, John Postel, arrived, someone who identified himself as a janitor, opened the gate blocking the back stairs. The man was in his forties, about 5'5", and dressed in work clothes. The two roofers carried some shingles up the back stairs, set them on the ledge and tossed them onto the roof. However, Sayles noticed that the bannister at the second landing was very wobbly. For that reason they decided not to use the stairway again. Instead they used their ladders, setting them up in the driveway on the south side. The only ladders they had with them were "forty footers."

Sayles did not tell anyone except Postel about the wobbly railing because no one else was around.

Postel, who is still one of the defendant's employees, also testified for the defendant. In general, his testimony was in accord with that of Sayles. When they first arrived on the job, a man identifying himself as the janitor opened the gate. The man was elderly, around 60, average height, about 5'10". They carried bundles up and laid them on the ledge below the roof. As they went up the stairs, they noticed the top bannister was wobbly. They could not reach the roof from the ledge so decided it would be better to set up their ladders on the south side (they could not set up ladders in back because the porch extended out too far). After they finished the back and south side, they moved the ladder to the west (front) side. The ladder was a 40-foot two-section ladder. They had no small ladders with them.

James Van Scoik, the janitor at 3912 North Pine Grove testified for the plaintiff on rebuttal. He had been the janitor there since 1958; there was no other janitor. He had never been on the back stairs until after the accident when he was asked to repair the railing. There had been no other repairs on the railing since 1958. He never had a key to the gate; as far as he knew only Mr. Vollen had a key. Van Scoik never opened the gate for the roofers; in fact, he never saw the roofers.

Stanley Sedivy, a consulting engineer, testified as an expert witness for the plaintiff. He stated that the placing of the ladder so that it rested against the middle of the railing with the top of the ladder extending two to three feet above the railing, each day for five days, with the men climbing the ladder two or three times during the period the work was in progress could possibly cause a latent or structural damage of the railing

which might contribute to a later failure. This is because the force applied when one climbs a ladder is dynamic, not static. He agreed that the age of the building and of the wood could make a difference. He did not believe that the fact that a basketball net was affixed to the porch would affect the railing, even if it was subjected to a constant bombardment from basketballs. In arriving at his conclusion he took into consideration only the ladder and the two men climbing the ladder (a total of, at most, three times) and the trucks in the area; he did not consider the age of the wood or the building, how the wood was fastened, or the basketball bouncing against it.

While the appellant has raised several claims of error on appeal, the only issues raised in his post-trial motion were that the verdict was against the manifest weight of the evidence and that the judgment was against an entity which was not in existence at the time of the occurrence and at the time of the lawsuit. Accordingly, all other issues have been waived. Supreme Court Rule 366(b)(2)(iii) Ill. Rev. Stat. 1975, ch. 110A, par. 366(b)(2)(iii); *Sabath v. Mansfield* (1978), 60 Ill. App. 3d 1008, 377 N.E.2d 161.

## I.

■■ "Jurors are supposed to be competent in everything pertaining to the ordinary and common knowledge of mankind. [Citation.] For this reason, they set the standard of care, except where the standard is fixed by law. Hence, whether conduct established by the evidence amounts to due care, or is negligence, is normally a question for the jury." (*Hays v. Place* (1953), 350 Ill. App. 504, 509, 113 N.E.2d 178, 180.) As trier of the facts, it is for the jury to determine whether the defendant committed the acts complained of, whether if he did, he was negligent, whether this negligence proximately caused the injury complained of and whether the plaintiff was contributorily negligent. (*Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, 126 N.E.2d 836; *Tipsword v. Melrose* (1973), 13 Ill. App. 3d 1009, 301 N.E.2d 614; *Ellis v. Howard* (1972), 4 Ill. App. 3d 852, 281 N.E.2d 793; *Smith v. 601 Liquors, Inc.* (1968), 101 Ill. App. 2d 306, 243 N.E.2d 367; *Hitt v. Langel* (1968), 93 Ill. App. 2d 386, 236 N.E.2d 118.) Verdicts are to be directed only where all of the evidence, when viewed most favorably to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand.

In the case at bar, the jury could conclude that the roofers had leaned a ladder against the railing although the average person could foresee that this might weaken the railing and cause some injury. They could also conclude the railing had been weakened by the use of the ladder so that when the plaintiff, in the exercise of ordinary care, leaned on or stumbled on the railing, it gave way. To be sure, there was evidence from the

defendant that it had no ladder which would reach the railing, that no ladder was placed on that side of the house and that the railing was already dangerously loose before the roofers commenced their work. But such evidence merely created a conflict as to the credibility of the witnesses, and it is well settled in Illinois that the jury is the sole judge of the credibility of the witnesses. *Preston v. City of Chicago* (1975), 34 Ill. App. 3d 322, 340 N.E.2d 251; *Bouillon v. Harry Gill Co.* (1973), 15 Ill. App. 3d 45, 301 N.E.2d 627; *Moore v. Checker Taxi Co.* (1971), 133 Ill. App. 2d 588, 273 N.E.2d 514.

■■ The defendant also argues that there was no showing that the defendant owed any duty to the plaintiff, apparently on the theory that there was no contract and there were no dealings between them. But, as stated by the Illinois Supreme Court in *Wintersteen v. National Cooperage and Woodenware Co.* (1935), 361 Ill. 95, 103, 197 N.E. 578, 582, and quoted by the court in *King v. Mid-State Freight Lines, Inc.* (1955), 6 Ill. App. 2d 159, 173, 126 N.E.2d 868, 875, *appeal denied* (1955), 5 Ill. 2d 631, and by the late Justice Dooley in his concurring opinion in *Renslow v. Mennonite Hospital* (1977), 67 Ill. 2d 348, 364-65, 367 N.E.2d 1250, 1258:

> "The contention is made by the defendant that it owed no duty of due care to the plaintiff, inasmuch as there was no contract between the plaintiff and the defendant. It is axiomatic that every person owes a duty to all persons to exercise ordinary care to guard against any injury which may naturally flow as a reasonably probable and foreseeable consequence of his act, and the law is presumed to furnish a remedy for the redress of every wrong. This duty to exercise ordinary care to avoid injury to another does not depend upon contract, privity of interest or the proximity of relationship between the parties. It extends to remote and unknown persons." (361 Ill. 95, 103.)

The jury having concluded, as it must have done, that a reasonable man would not have leaned a ladder against the railing foreseeing that damage was likely to occur if it did, it follows that the defendant had a duty to the plaintiff to act as a reasonable person and guard against the occurrence of injury. It does not matter that the defendant could not have foreseen that it would be the plaintiff who would be injured; it was enough that injury to some person was foreseeable.

## II.

The appellant's only other contention which was properly preserved for review is that since there is nothing in the pleadings, the verdict or judgment as to who or what was doing business using the name Consumers Roofing and Insulating Company in March 1971, the verdict

and judgment is against a nonentity. The appellant cites no rule, and we know of none, which would require a plaintiff to describe in detail a defendant he is suing. Suffice it to say that in this case the defendant was served as Consumers Roofing and Insulating Company, filed its pleading as Consumers Roofing and Insulating Company and went to trial as Consumers Roofing and Insulating Company. At no time before judgment did it object to the appellation. The judgment obviously is against the party who chose to litigate under the name Consumers Roofing and Insulating Company, whether in fact that is its name or not, and whether it be an individual, partnership or corporation. Compare *Sjostrom v. McMurray* (1977), 47 Ill. App. 3d 1040, 362 N.E.2d 744.

There is no question that it was the defendant who repaired the roof at 3939 North Pine Grove. The defendant in its answer admitted it.

On oral argument, the defendant suggested that because it was not a corporation it had not been properly served. But, of course, any defect in service was waived when it filed a general appearance. *Mason v. Freeman National Printing Co. Ltd.* (1977), 51 Ill. App. 3d 581, 366 N.E.2d 1015.

Accordingly the judgment of the trial court is affirmed.

Affirmed.

JOHNSON, P. J., and LINN, J., concur.