Michael Stowers, a Minor, by Venita Stowers, His Mother and Next Friend, Appellee, v. Charles Carp, Doing Business as Peoples Furniture Company, Appellant.

**Gen. No. 11,438.**

Second District, Second Division.
February 1, 1961.
Rehearing denied March 13, 1961.

54

Harrison Kavensky, and Schoede, Schoede and Kavensky, of Rock Island, for appellant.

Eagle and Eagle, and Winter and O'Toole, of Rock Island, for appellee.

CROW, P. J.

This is an action brought on behalf of a minor plaintiff, Michael Stowers, 5 years and 2 months old, to recover damages for injuries he received April 28, 1958 when he was run over by the defendant Charles Carp's truck. The jury returned a verdict for the plaintiff in the amount of $15,000.00, judgment was entered thereon, the defendant's post trial motions for judgment notwithstanding the verdict and for new trial were denied, and this appeal by the defendant followed. The defendant's motion for directed verdict at the close of the plaintiff's evidence had been denied; and on the defendant's similar motion at the close of all the evidence the Court had reserved a ruling and after the verdict the Court denied that motion.

The complaint charges that on or about April 28th, 1958 two employees of the defendant drove a large van or truck into Arsenal Courts, a housing project in the City of Rock Island; the plaintiff lived in Arsenal

Courts; the employees then and there operated the truck in a northerly direction in a narrow alley lying between Third and Fourth Streets in Arsenal Courts; a great many rear yards there abutted on the alley and the employees knew, or, in the exercise of reasonable care, should have known that a large number of children lived in the homes on both sides of the alley and used the rear yards of their homes as a play area; the employees in the operation of the truck or van struck and injured the plaintiff by reason of negligence in that they failed to maintain a proper lookout, failed to stop although they should have known that they were running over a child, failed to sound a warning, and failed to use due care or sound the horn. The defendant's answer so far as now significant denies the charges and no questions are raised here on the pleadings.

The defendant's theory is that there is a complete failure of competent evidence of negligence on the part of the defendant and the allegations of negligence in the complaint under the facts did not constitute negligence, and the court should have directed a verdict in his favor or allowed his motion for judgment notwithstanding the verdict; in addition, it is the defendant's theory that the court erred in refusing to grant his right to take the discovery deposition of the plaintiff, in declaring the plaintiff incompetent to testify, in refusing certain of the defendant's instructions and in giving certain of the plaintiff's instructions over the defendant's objections; the judgment is against the manifest weight of the evidence; and the verdict is grossly excessive, manifesting passion and prejudice.

The plaintiff's theory is that the question of the defendant's alleged negligence was a question of fact, properly submitted to the jury, and the defendant was not entitled to a judgment notwithstanding the verdict; the verdict is not contrary to the manifest weight of the evidence; the damages found in the verdict are not

excessive; the court did not abuse its discretion in determining the plaintiff was not a competent witness; there were no errors in the instructions, and the defendant is not in a good position to complain as to that because he tendered an excessive number of instructions.

All of the witnesses were witnesses called by the plaintiff except the defendant who was called under Section 60 of the Civil Practice Act, and except a court reporter witness called by the defendant who had taken a pretrial statement of one of the plaintiff's witnesses. The evidence is substantially as follows:

On April 28, 1958 the plaintiff Michael Stowers, age 5 years and 2 months, was living at 1454 4th Street with his parents and brothers and sisters in an apartment building which was part of a housing development known as Arsenal Courts, in Rock Island. Four large apartment buildings faced east on 4th Street and three large apartment buildings faced west on 3d Street. An alley ran north and south between 3rd and 4th Streets at the rear of these buildings. The alley was narrow—being only nine feet wide. The back yards behind the apartment buildings on both streets were small—the distance between the rear doors of the buildings and the alley being only 23 feet 8 inches. There were no fences extending north and south along either side of the alley. The view of the back yards was relatively unobstructed. There were no garages or other buildings along the alley—the only obstructions being some clothes poles and a few trees. Fifty-six different families lived in those seven apartment buildings, each family having an average of three children, so that over one hundred and fifty children lived along and played in the back yards abutting this particular alley. The alley was used by vehicles and trucks.

58

On the day in question the defendant Charles Carp, who operated a furniture store known as Peoples Furniture Company, or Cheerful Charley's, dispatched a large van-type truck to Arsenal Courts to repossess some furniture from a Mrs. Dufur, who lived in one of the apartment buildings, her address being 1503 3rd Street. The truck was 18 feet long, had a 2½ foot tailgate, weighed 9280 pounds, was about 8 feet wide, and its body was 10½ feet high. The truck was operated by two men, a driver and a helper. Both the driver and the helper had been in Arsenal Courts on a number of previous occasions and were familiar with the narrow alleys and the fact that a great many small children customarily played in the neighborhood. The truck arrived at around 10 a.m. and the driver and helper drove the truck into the nine foot alley at the rear of Mrs. Dufur's residence and stopped at the rear in the alley facing north. A number of small children gathered around the large van. Various witnesses estimated the number of children as being 8 or 10, referring to them as "quite a crowd." Michael Stowers was among the group, and he held the door of Mrs. Dufur's residence open while the two men took out Mrs. Dufur's furniture. It took them from three-quarters of an hour to an hour to remove that furniture. Mrs. Dufur's address was about a block south of where the later accident occurred. They still had to pick up Mrs. Dufur's stove, which was at a different address. As they prepared to leave, the driver and helper "shooed" all the children away from the truck. One of Mrs. Dufur's small children cried and raised quite a fuss because he wanted to go along too, and she placed her child in the yard away from the truck. The driver, Gail Felsman, got in, the helper, Frank Freeborn, got in the middle, and Mrs. Dufur, who was only 5 feet ¼ inch tall, got into the right outside seat of the high cab of the van. As the truck proceeded slowly north-

ward up the alley, they may have been conversing—Mrs. Dufur was giving the driver and his helper directions as to how to get to the address where her stove was located. The truck was travelling about 5–10 m.p.h.

The weather was clear, though dreary, and the sun was not out. The alley was dry. The windows of the cab were down. The truck was in good shape, and the motor was not particularly noisy. Two large rear vision exterior anti-diagonal mirrors were on the truck, one on each side, so that both the driver and his helper could have obtained a good view to the rear along both sides of the truck—the driver could see through the mirrors to the rear of both sides of the truck—and the party in the middle could see in the right hand mirror by moving his head a few inches.

After the truck had gone up the alley about 200 feet and was behind the residence of a Mrs. Self, who lived at 1402 4th Street, the truck struck a garbage can alongside the alley. Mrs. Self, who was seated at her kitchen table drinking coffee, heard the scream of a child, jumped up and ran to her window. Her kitchen faced the alley. She saw the plaintiff, Michael Stowers, under the truck trying to crawl away from the right rear dual wheels. The truck was going at a slow pace, and the right rear wheels passed over the lower portion of Michael's body. Mrs. Self ran to her rear door, and yelled at the truck driver to stop. The truck stopped. She did not know what the plaintiff was doing prior to this time. When she first saw him his legs were going over the truck. The truck was going over him and he was "scooting" at the same time. The boy was lying on the right or passenger's side.

Mrs. Morris, who lived 113 feet further north up the alley, at 1355 3rd Street, was in her kitchen doing dishes, at the back of her apartment. She also heard the cry of a child. She looked out the back door, saw

60

a truck coming, and the plaintiff was on the ground in back of the truck. The truck was moving very slowly. She hollered to the driver to stop. She went outside. She saw one turned over garbage can. The plaintiff was lying with his head to the east on the ground and his legs in the alley. She did not see the accident.

The truck stopped within 20 feet of the plaintiff lying in the alley, and Mrs. Dufur, the helper, and the driver got out. Mrs. Self told the driver that he had run over a child, but the driver said that he just thought he was running over a garbage can. A garbage can was down in the alley, the lid crushed. Michael was lying face up, the upper half of his body being in Mrs. Self's back yard, the lower half of his body being in the alley.

No one in the truck heard or saw the plaintiff just prior to the impact, or felt the impact on the child at the time.

Gail Felsman testified, in part, that he was the truck driver on the occasion in question; he went to Mrs. Dufur's house in Arsenal Court around 9:00 a.m. to pick up some furniture; there was a street in front of her house and an alley to the rear of her house that ran north and south. He said: "The alley is 9–10 feet wide and the truck is 8 feet wide. . . . There were 8–10 children around. I saw the Stowers boy there. We made a number of trips to the house. We were there about an hour. After loading the furniture, the helper and Mrs. Dufur got in the cab of the truck with me. We were going to another address to get a stove. Mrs. Dufur told us how to get there. The truck mirrors were on both sides of the truck so you could see to the rear. We were heading north. . . . After we went up the alley, I believe we pushed a garbage can over. I didn't stop when I pushed the can over. . . . I came up the alley about one-half block after I pushed the garbage can. I never heard a cry from any other child

61

and that would be from the time I pushed the garbage can over. I stopped two or three car or truck lengths away. I stopped the truck when a lady waved her arms. I got out of the truck, ran back to where the lady was and she told me I hit a little boy. I then saw the boy lying there. . . ." On cross examination he testified that after putting the furniture in the truck he closed the doors and then got into the truck, and "At that time Mrs. Dufur's children were around the truck. There were no other children there. . . . I didn't see any child come out in front of me. I didn't see any child at any time as I proceeded down the alley. . . . The only thing I felt before the accident was the lid of the garbage can which I was talking about before. I heard nothing. I believe my windows were down. We smoked cigars and usually have the windows down."

Frank Freeborn, the driver's helper, testified, in part, that "Mrs. Dufur was just sitting in the truck. She may have been talking and giving us the address. Several hundred feet north of Mrs. Dufur's house I saw a garbage can partially in the yard and partially in the alley. It sounded like we pushed it with the rear wheels of the truck. I don't know if I heard a child at the precise moment of the accident. . . . When I heard the truck push the garbage cans, I don't recall any scream at the time. I heard a woman scream something about hitting a child. I didn't feel anything. . . . We kept going for a short distance until we heard this woman screaming. I got out of the truck. . . . I went back to where the boy was. We were travelling about 5 miles per hour. I definitely did not see any boy come out in front of the truck. I never saw a boy anywhere as we were going down the street, either in front of the truck or where it was visible to us. . . . I don't recall looking into the right hand mirror. . . ."

Michael Stowers was removed to Moline Public Hospital. Fluid was injected into his bladder and X-

rays indicated that his pelvis was fractured in a number of places and his pubic bones were separated. The X-rays also showed that fluid was escaping from his bladder, demonstrating that he had also incurred a ruptured bladder. He was operated upon immediately. A large blood clot was removed, and the bladder was drained and repaired. Two abdominal drains were placed. Also, to insure proper healing, two catheters were placed and a small balloon was inserted to keep them in place. The various drains were kept in place for approximately six weeks and Michael remained in the hospital for two months. After leaving the hospital, he reported to the physician at gradually lengthening intervals and the physician checked him by inserting a catheter to determine if he was maintaining his channel. The physician testified that it would be necessary to continue to check him in the future to see that he maintained continuity of elimination. The hospital, doctor and other medical expenses amounted to $1499.00 at the time of the trial. He is able to engage in normal activities. The operation was a success and it was a good result for that type of injury.

As to whether there was a complete failure of competent evidence of negligence of the defendant and whether the Court should have directed a verdict in his favor or allowed his motion for judgment notwithstanding the verdict, the question is whether there is any competent evidence, together with all reasonable inferences to be drawn therefrom, standing alone, taken with all its intendments in an aspect most favorable to the plaintiff, tending to prove and from which the jury might reasonably find negligence of the defendant; on this point we are not concerned with the weight or credibility of the evidence; reasonable inferences may be drawn by a jury from established facts, and a verdict may not be set aside merely because the jury could have drawn different inferences from the evi-

63

dence; it is one of the jury's duties to settle the dispute by choosing what seems to them to be the most reasonable inference; only where there is a complete absence of probative facts to support the inference or conclusion drawn by the jury is it reversible error to overrule a motion for judgment notwithstanding the verdict: King v. Mid-State Freight Lines, Inc. (1955) 6 Ill. App.2d 159, 126 N.E.2d 868; Lindroth v. Walgreen Co. (1950) 407 Ill. 121, 94 N.E.2d 847; Finley v. New York Cent. R. Co. (1960) 19 Ill.2d 428, 167 N.E.2d 212; Lavender v. Kurn (1946) 327 U. S. 645, 90 L. Ed. 916; Tennant v. Peoria & P. U. Ry. Co. (1943) 321 U. S. 29, 88 L. Ed. 520; Lessen v. Allison (1960) 25 Ill.App.2d 395, 166 N.E.2d 806; Stilfield v. Iowa-Illinois Gas & Elec. Co. (1960) 25 Ill.App.2d 478, 167 N.E.2d 295.

 Where children are known to be or may reasonably be expected to be in the vicinity, a degree of vigilance commensurate with the greater hazard created by their presence or probable presence is required of a driver of a motor vehicle to measure up to the standard of what the law regards as ordinary care, and whether under those particular circumstances the driver's conduct measures up to that of an ordinarily prudent driver and whether a lack of due care by him caused the accident are ordinarily questions of fact for a jury to decide: Coca Cola Bottling Co. v. Hubbard (1953) 203 F.2d 859. The operator of a motor vehicle who, under the particular circumstances presented, is or should reasonably be cognizant of the proximity of children must exercise ordinary care to discover their presence upon or near his vehicle and ordinary care under the circumstances to avoid inflicting injury upon them; it is ordinarily necessary to exercise greater care for the safety of young children than for adults possessing normal, mature faculties; children's conduct is unpredictable and one operating a motor vehicle under those circumstances should an-

64

ticipate their thoughtlessness and impulsiveness; their presence or probable presence is in itself a warning; if the driver has knowledge or should, under the circumstances, have had knowledge of their presence he may in a particular case be liable even though he did not see the child in time to prevent the injury; ordinarily whether a driver should, under the circumstances, have been alerted to the necessity of looking for the presence of children is one of fact for the jury to solve as well as whether the duty, if it arose, has been properly performed: Kading v. Willis (1955) 286 Pac.2d 861, D. C. App. Cal.; Maletis v. Portland Traction Co. (1938) 83 Pac.2d 141, Ore.; Ruggiero v. Mello (1955) 130 N.E.2d 555, Mass.; Stein v. Palisi (1955) 125 N.E.2d 575, N. Y. If the operator of the motor vehicle knows, or should, under the circumstances, know that children are in and along a street, or alley, the operator must, under such circumstances, recognize that such children may be unmindful of danger and it is his duty to exercise reasonable care commensurate with the circumstances: Ogden v. Keck (1929) 253 Ill. App. 444; Kuzminski v. Waser (1942) 314 Ill. App. 438, 41 N.E.2d 1008.

█ This accident occurred in a narrow, 9 foot wide alley at the rear of several large apartment buildings, in a crowded residential area, where there were many children, who customarily played in the small back yards areas and alley and there were no fences to separate the back yards from the alley. The defendant's truck was a large van type truck, 18 feet long, 8 feet wide, and the body was 10½ feet high. It necessarily occupied almost the entire width of the alley. The driver and helper had been in that area before, knew of the narrow alley, knew that many small children played around there, and saw several such children, including the plaintiff, around and near the truck while they were loading the truck at a point some 200 feet south of where the accident occurred. The

time was in the morning—10 a.m. The weather was clear. Children might be expected to be out playing, and were. When they started north up the alley from Mrs. Dufur's the helper sat in the middle, not on the right side of the seat of the cab of the truck. Why he was not on the right side is not explained. The driver and helper could have obtained a good view to the rear along both sides of the truck by using the two large rear vision anti-diagonal exterior mirrors—the driver could have seen through the mirrors to the rear of both sides of the truck—and the helper, even though in the middle, could see to the right rear by moving his head a few inches. The driver and helper apparently did not look to the sides or rear of the truck or use the rear vision mirrors after leaving Mrs. Dufur's until the accident. The plaintiff was only 5 years 2 months old at that time. It is proverbial that one can never tell what a child of that age may do in an alley or street— they may, and frequently do, exercise no caution or judgment—they may, and frequently do, act upon impulse and intuition. In some manner the child was near or under the truck at a point in the alley about at the rear of Mrs. Self's about 200 feet north of Mrs. Dufur's. A child—presumably the plaintiff—screamed. Mrs. Self heard the cry and saw the plaintiff trying to crawl away from the right rear wheels. Mrs. Morris, about 113 feet further north, heard the child's cry. Apparently neither the driver or helper heard the cry. Nor did they see the plaintiff after leaving Mrs. Dufur's until after the accident. Under the circumstances, we cannot say there was a complete absence of probative facts to support the inference or conclusion drawn by the jury of negligence on the part of the defendant in failing to maintain a proper lookout, or failing to stop although they should have known they were running over a child. There was no error in not directing a verdict for the defendant or in not allowing his post trial motion for judgment notwithstanding the

verdict. The trial judge, on three separate occasions, having an opportunity to observe the witnesses as well as hear their testimony, considered those same questions, and concluded there was evidence to support the plaintiff's case, and we are not disposed to disagree with the trial judge's conclusion in those respects.

██ ██ As to whether the judgment is against the manifest weight of the evidence, it must be determined whether an opposite conclusion is clearly evident, whether the verdict is clearly, plainly, or undisputably against the preponderance of the evidence: Hulke v. International Mfg. Co. (1957) 14 Ill.App.2d 5, 142 N.E. 2d 717; Hocker v. O'Klock (1960) 24 Ill.App.2d 259, 164 N.E.2d 225—and, so tested, we cannot say the judgment is against the manifest weight of the evidence.

██ As to whether the amount of the verdict is grossly excessive—$15,000.00—the amount of damages is primarily a question of fact for the jury to determine, and the Court may not alter that determination unless the size clearly indicates it to be the result of prejudice or passion or improper motive: Tomlinson v. Chapman (1960) 24 Ill.App.2d 192, 164 N.E.2d 240; Murphy v. Lindahl (1960) 24 Ill.App.2d 461, 165 N.E. 2d 340; Hulke v. International Mfg. Co. supra, and, so considered, we do not believe the verdict is so grossly excessive as to indicate prejudice, passion, or improper motive, or to require any change by us. The injuries were serious and painful. Some continued medical checking or treatment is indicated. The special damages were substantial.

With regard to the defendant's argument that the Court erred in refusing to grant him the right to take the discovery deposition of the plaintiff and in declaring the plaintiff incompetent to testify, the defendant had, during the pendency of the cause, given notice of the taking of the plaintiff's discovery deposition. The plaintiff filed a moton for a hearing to determine whether the minor plaintiff was compe-

tent to testify. The defendant filed a motion to strike that plaintiff's motion. A hearing was held in April, 1959 at which the plaintiff, not sworn, was examined by counsel for the plaintiff and the Court—counsel for the defendant not putting any questions —and the Court entered an order to the effect that the plaintiff was not competent to give testimony or a deposition at that time, reserving ruling as to whether he might or might not be competent at some later date. At that hearing the minor plaintiff, then about 6 years 2 months old, said, among other things, he did not know why they were in the Court room, or what hospital he was in, or how long he was there, or how he got under the truck wheel, or how the wheel went over him, or what an oath is, or what it is to swear to tell the truth, or what would happen if he did not tell the truth. Again in November, 1959 another hearing was held on his competency, the plaintiff then being about 6 years 9 months old, and again the Court entered an order to the effect he was not competent to testify and could not be called under Section 60 of the Civil Practice Act. At that hearing he was again examined, not sworn, by counsel for the plaintiff and defendant, and he said, among other things, he did not know the name of his school, or what grade he was in, or what city the hospital is in, or what it is to swear to tell the truth or to take an oath, or why he was in the Court room.

In Hollaris v. Jankowski (1942) 315 Ill. App. 154, 42 N.E.2d 859, the Court said there was no hard and fast rule, by statute or Supreme Court decision, with respect to the minimum age at which a minor is permitted to testify, and held an 8 year old boy was not competent and should not be allowed to testify relative to an injury when he was between 4–5 years old. In People v. Willson (1948) 401 Ill. 68, 81 N.E.2d 485, the Court said there were no cases where the testimony

68

of a child younger than 6 years old had been admitted in Court and there were many cases where the testimony of a child of more mature years had been rejected. Cf. Kading v. Willis (1955) 286 Pac.2d 861, D. C. App. Cal.

Depositions have to be taken before some officer authorized to administer oaths: Ch. 110 Ill. Rev. Stats., 1959, par. 101.19–2; the officer before whom the deposition is to be taken shall put the witness on oath: par. 101.19–6(2); when the testimony is transcribed the deposition shall be submitted to the deponent for examination and shall be read to or by him, unless waived by the deponent and by the parties: par. 101.19–6(4); and a discovery deposition may be used only for the purpose of impeaching the testimony of deponent as a witness, as an admission made by a party, or if otherwise admissible as an exception to the hearsay rule: par. 101.19–10.

The minor plaintiff, slightly over 6 years old at the times of those pretrial hearings, evidently did not understand or comprehend what an oath is, and there is nothing to indicate that, if a deposition had been taken and the testimony transcribed, he could have examined the same, or read it, or understood it if read to him, and it was extremely dubious whether the plaintiff knew the relationship and significance of the facts concerning which he was to be examined or could accurately describe those facts.

Under Supreme Court Rule 19–5, Ch. 110 Ill. Rev. Stats., 1959, par. 101.19–5(2), ". . . After notice is served for taking a deposition, on motion seasonably made by any party or by the deponent, for good cause shown, the Court may order that the deposition not be taken . . . ." This subsection "gives the court broad powers to control and direct discovery procedures, whenever necessary, and to prevent abuses of the liberal discovery the 1955 revised rules permit": Historical

and Practice Notes, Ch. 110 Smith-Hurd Ill. Ann. Stats., par. 101.19–5, p. 147.

 The pretrial orders of April, 1959 and November, 1959 were, in effect, orders that the deposition not be taken. Under the circumstances we believe "good cause" was shown for such and there was no abuse of any judicial discretion. Generally, though not exactly, analogous situations are: Fritsch v. Central Trust Co. (1941) 30 N.Y.S.2d 934, N. Y. App. Div.; Bennett v. Ros (1950) 120 N.Y.S.2d 283, S. C. N. Y., Spec. Term.

The defendant suggests the only applicable Supreme Court Rule is Rule 19–9(3)(a): Ch. 110 Ill. Rev. Stats., 1959, par. 101.19–9(3)(a), which, so far as now concerned, reads ". . . otherwise objections to the competency of the deponent or admissibility of testimony may be made when the testimony is offered in evidence." The proposed deposition here being a discovery deposition, the testimony therein, had it been taken, might never have been offered in evidence and hence an opportunity to make such objection in that manner might never have been available thereunder. Rule 19–9(3)(a) hardly covers the situation here concerned. Rule 19–5(2) apparently does.

 The defendant urges the Court erred in refusing his defendant's instructions numbers 8, 15, and 23, and in giving the plaintiff's instruction number 7.

The defendant's refused instruction number 8 was:

> "The Court instructs the jury that it is not every accident which makes a person liable for damages for personal injury. If the accident is unavoidable so far as the defendant is concerned, then no liability is incurred by defendant whether as a result of the accident, the plaintiff was injured, and if the jury in this case believe from all the evidence and under the instructions of the court that so far

70

as the defendant is concerned, the injury to said plaintiff was unavoidable, then the jury should find the defendant not guilty."

The first sentence thereof would have tended to mislead the jury and was erroneous: Fetterman v. Production Steel Co. of Illinois (1955) 4 Ill.App.2d 403, 124 N.E.2d 637. The substance of the balance thereof was covered by the defendant's given instruction number 7.

The defendant's refused instruction number 15 was:

"The Court instructs the jury that even though the law is that a child under the age of seven years is not presumed to be capable of any negligence contributing to his injuries, nevertheless, before you would be permitted to return a verdict for said minor child and against the Defendant, it is incumbent upon the Plaintiff to prove by the greater weight of the evidence that the injury to said minor child resulted proximately from the negligent act of the Defendant."

The defendant cites us no authorities for that. The substance of the same, so far as it is proper, was contained in the plaintiff's given instructions numbers 5, 9, and possibly 12, and the defendant's given instruction number 20.

The defendant's refused instruction number 23 was:

"The Court instructs the jury that the defendant employees have the lawful right to use the alley wherein the accident occurred."

The defendant cites us no authorities for that. The instruction tendered was without any reference to the evidence—it merely stated an abstract principle, which might or might not be correct, depending on the circumstances—it sharply emphasized a general abstract

right which was not as such directly in issue: Garvey v. Chicago Rys. Co. (1930) 339 Ill. 276, 171 N. E. 271.

The plaintiff's given instruction number 7 was:

> "You are instructed that if you find from the greater weight of the evidence that the employees of Charles Carp knew or by the exercise of ordinary care should have known that Michael Stowers was in the alley and that said employees, by the exercise of ordinary care on their part, could have avoided the accident, then it was their duty to exercise ordinary care, and if you find that they did not exercise ordinary care and thereby caused Michael Stowers' injuries, then it would be proper for you to return a verdict in favor of Michael Stowers."

That instruction is not objectionable: Popadowski v. Bergaman (1940) 304 Ill. App. 422, 26 N.E.2d 722; Kavanaugh v. Washburn (1943) 320 Ill. App. 250, 50 N.E.2d 761; Keller v. Menconi (1955) 7 Ill.App.2d 250, 129 N.E.2d 341.

Representative of the cases cited by the defendant are: Tucker v. New York, C. and St. L. R. Co. (1957) 12 Ill.2d 532, 147 N.E.2d 376; Morrison v. Flowers (1923) 308 Ill. 189, 139 N. E. 10; Buckley v. Mandel Bros. (1928) 333 Ill. 368, 164 N. E. 657; Herndobler v. Goodwin (1941) 310 Ill. App. 267, 34 N.E.2d 8; Anderson v. Samuelson (1950) 342 Ill. App. 516, 97 N.E.2d 353; Ohio Bldg. Safety Vault Co. v. Industrial Board (1917) 277 Ill. 96, 115 N. E. 149; Coutrakon v. Distenfield (1959) 21 Ill.App.2d 146, 157 N.E.2d 555; Nesbit v. Streck (1930) 259 Ill. App. 48; Parkin v. Rigdon (1954) 1 Ill.App.2d 586, 118 N.E.2d 342; and Eilers v. Chicago Transit Authority (1954) 2 Ill.App.2d 233, 119 N.E.2d 449. We believe none are decisive of the case at bar, and some are only indirectly applicable. To the extent the principles of some may be applicable we have been

guided thereby as well as by the other authorities referred to. We believe none militate against our views.

There being no reversible error, the judgment will, accordingly, be affirmed.

Affirmed.

WRIGHT, J. and SPIVEY, J., concur.