# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Merca v. Rhodes**, 2011 IL App (1st) 102234

---

| | |
|---|---|
| Appellate Court Caption | JACOB MERCA, Individually and as the Administrator of the Estate of Cassandra Merca, Decedent, Plaintiff-Appellant, v. DIANA J. RHODES, Defendant-Appellee. |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-2234 |
| Filed | September 30, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a wrongful death action arising from the fatal injuries decedent suffered when she was struck by defendant's car while crossing a busy intersection with some of her fellow high school students, the trial court erred in entering summary judgment for defendant based on its finding that the death was an "unavoidable accident," since the case was not suitable for summary judgment where the evidence raised genuine issues of material fact as to the percentage of decedent's contributory negligence and whether defendant was exercising ordinary care in view of her knowledge that a high school was in the area, that children might be present, and the range of speed the witnesses said she was traveling. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-L-9914; the Hon. Eileen Brewer, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Samuel L. Evins, of Evins & Sklare, Ltd., and Leslie J. Rosen, both of Chicago, for appellant.

Jon Yambert and James V. Custodio, both of Chilton Yambert & Porter LLP, of Chicago, for appellee.

Panel

PRESIDING JUSTICE R. GORDON delivered the judgment of the court, with opinion.

Justices Cahill and Lampkin concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiff Jacob Merca, individually and as the administrator of the estate of Cassandra Merca (decedent), appeals an order of the circuit court of Cook County granting summary judgment in favor of defendant, Diana Rhodes, finding that the death of the decedent was an "unavoidable accident" in a wrongful death action resulting from an automobile collision with decedent, a 14-year-old pedestrian. Plaintiff argues that the evidence presented showed a genuine question of material fact and should be decided by a jury. For the following reasons, we reverse.

¶ 2                    I. BACKGROUND
¶ 3                    A. Parties
¶ 4    Plaintiff Jacob Merca brought a wrongful death action individually and on behalf of his daughter, decedent Cassandra Merca, against defendant Diana Rhodes, the driver of the vehicle that struck the decedent and another girl, Natalie Roth (Natalie). There were multiple eyewitnesses at the scene. Evayn Roper (Evayn), Andrea Colisimo (Andrea), Jessica Roche (Jessica), Sharon Dorencz (Sharon), Cesar Pacheco (Cesar) and Palos Park police officer Jason Caiazzo (Caiazzo) all gave depositions as to the occurrence that were included as part of the summary judgment proceedings. Accident reconstruction experts Chicago Ridge police officer Eric Kaspar (Kaspar) and Warren Beine (Beine) also gave depositions and provided their opinions as to the occurrence. Natalie also gave a deposition.

¶ 5                    B. Plaintiff's Arguments
¶ 6    Plaintiff argues that there was a question of material fact as to whether the accident was avoidable, claiming that the questions of negligence and proximate cause are questions that must be decided by a jury. Plaintiff argues that the defendant breached the duty owed by an automobile driver to pedestrians since she knew that there might be children present at the intersection at the time of the accident and she should have been driving at a slower rate of

speed. Plaintiff further argues that the defendant's negligence was a proximate cause of the decedent's death.

¶ 7                                   C. Motion for Summary Judgment

¶ 8        Defendant filed a motion for summary judgment on June 18, 2010, arguing that she did not breach her duty of using due care as she was driving her vehicle and did not proximately cause the death of the decedent. Defendant argues that there was nothing the defendant could have done to avoid the accident, because the decedent appeared in front of the defendant's vehicle "only a split second before impact."

¶ 9                                          D. The Occurrence

¶ 10       Natalie, age 15, testified in a discovery deposition that on March 22, 2007, she, the decedent and Evayn, age 15, were scheduled to participate in a girls' junior varsity water polo game at Carl Sandberg High School, where they were students, at 6 p.m. The girls were required to attend the varsity game at 5 p.m. School was over at approximately 3 p.m. Natalie testified that after the girls left school at 3 p.m. they intended to go to a nearby Jewel to purchase some food. The Jewel is located in a shopping center, located at the intersection of 131st Street and 97th Avenue. The high school is located at 13300 South LaGrange Road, also known as 96th Avenue in Palos Park. 131st Street is a public highway that has two lanes running in an easterly direction and two lanes in a westerly direction with turning lanes and a 40-mile-per-hour speed limit. LaGrange Road (96th Avenue) is a public highway that runs in a northerly and southerly direction. There are two signs warning drivers of a crosswalk and that there may be children crossing at the intersection. Natalie testified that walking over to the Jewel was a common occurrence for the girls because the school did not have food available for them before athletic events.

¶ 11       Natalie testified that at the time of the occurrence at or about 4 p.m., eastbound traffic on 131st Street was backed up all the way into the crosswalk at 96th Avenue and some of the traffic was backed up into the intersection at 97th Avenue. The crossing guards were not in attendance at this hour. When the girls arrived at the intersection, the light was green for both eastbound and westbound vehicular traffic on 131st Street. Natalie testified that she was familiar with the intersection, and kids from school "often cross over to the shopping center from the high school." The girls started to walk across 131st Street starting from the southeast curb in the crosswalk against the light, and Natalie observed that the westbound lanes were clear even though the eastbound lands were backed up into the intersection and the crosswalk that the girls were using. Natalie testified the girls wove in between the backed-up eastbound vehicles that were in the crosswalk and stopped in the middle of the street. After leaving the curb, they started to walk then jog across the street; the decedent ran first, Natalie followed, and Evayn was third. Natalie passed the decedent and continued to jog or run into the westbound lanes when the defendant's vehicle struck her in the right leg causing her to fall to the ground. She did not look to her right for westbound vehicular traffic before she was hit. The decedent was then struck by defendant's vehicle.

¶ 12       Natalie did not observe the vehicle coming so she could not determine how fast it was

moving, nor did she hear any sound (squealing) of brakes being applied. After Natalie was struck, she testified the decedent was also struck and knocked into the air by defendant's vehicle. Natalie did not know whether they were still in the crosswalk when the impact occurred. However, Natalie testified she "did not see" the impact with the decedent. The decedent landed on her head, was rendered unconscious and taken to a hospital by ambulance where she later died.

¶ 13    Natalie testified that there are normally children on or about the school area well after the school classes actually are over.

¶ 14    Evayn testified in a discovery deposition to substantially the same events as described by Natalie. Evayn testified that she had walked to the Jewel "regularly" and that it was "common" for a lot of members of the water polo team to visit the Jewel before games. Evayn testified that she "push[ed] a button on the pole that controls the 'walk' signals." Evayn testified that the signal said "Don't Walk" and then Natalie, the decedent and Evayn started running. Evayn testified she then turned around to walk back, but then turned back around to see if Natalie and the decedent had also turned to follow her back to the corner.

¶ 15    Evayn testified that when she turned back to look for Natalie and the decedent, they were both running toward the westbound lanes. Evayn then characterized their pace as a "fast jog." Evayn testified she did not observe the defendant's vehicle "until a split second before" impact with Natalie and she had to "look through cars in the eastbound lane" in order to observe the accident. Evayn testified "I saw them running and then I saw the car come. It was like not like a second after when I first saw the car, it was fast." Evayn further testified that she heard no horns and no sounds of brakes, no screeching of tires, and that the vehicle did not swerve. Evayn testified that after Natalie was hit, the decedent was then hit by the "middle" of the "front bumper" of defendant's vehicle. Evayn testified the decedent was knocked in the air and then landed in the street, unconscious, and that she, Evayn, then ran back to the school to tell the coaches.

¶ 16    The defendant, a school teacher employed by North Palos School District 117, testified in a discovery deposition that she was on her way home after stopping to have her car washed at a Shell station located near the subject intersection. She knew that the high school was in the vicinity and covered the area on 131st Street up to LaGrange Road. Defendant testified she "had been down that road dozens of times," and there was "heavy traffic" proceeding eastbound on 131st Street. Defendant's "best estimate" of her highest speed on 131st Street was between 30 to 35 miles per hour. She knew the speed limit on 131st Street to be 40 miles per hour. Defendant testified that as she approached the intersection in a westerly direction, her foot was on the accelerator when she observed both Natalie and the decedent running between the motor vehicles on her left. Her first reaction was to stop her vehicle, but she admitted she did not know if she managed to hit the brake by the time she hit the decedent.

¶ 17    The defendant testified that one of the girls was in front of the other and that she was not aware that she had struck Natalie with the right front edge of her vehicle. Defendant then testified she struck the decedent "between the driver's side and the middle" of her vehicle. Defendant testified there were no obstructions to her vision "other than the vehicles" in the eastbound lane.

-4-

¶ 18      There were multiple eyewitnesses at the scene. Andrea Colisimo, age 17, was in a vehicle with Jessica and Sara Olson (Sara). Andrea testified at a discovery deposition that she was in the front passenger seat in Sara's vehicle, a large Dodge Ram pickup truck. Andrea testified their vehicle was first in line in the left turn lane for westbound traffic, and that they had a green light but could not turn because of the stopped traffic in the eastbound lanes of 131st Street. Andrea also testified that there are signs on 131st Street indicating that drivers should be cautious, as there is a school crosswalk ahead. Andrea then testified that due to the signs, she "knew that [she] should be cautious." Andrea further acknowledged that it was common for the eastbound traffic on 131st Street to be backed up at 4 p.m. and for the traffic to be blocking the intersection and crosswalks. Furthermore, Andrea testified it was not unusual for students to "zigzag" between the stopped eastbound traffic in the crosswalk to continue on their way to the shopping mall.

¶ 19      Andrea observed Natalie and the decedent passing between the eastbound vehicles. Next, Andrea observed Natalie and the decedent "running" past the front of the Dodge Ram where she was seated. Andrea testified one of the girls was a "couple feet" in front of the other, and that prior to the impact, she observed the defendant's vehicle "out of the corner of her eye." Andrea testified that she observed the defendant's vehicle "a split second before the impact occurred." Andrea testified she "saw the impact," and observed the decedent "fly up in the air." Andrea testified she heard the screeching of brakes, but she does not recall whether it was before, during, or after the impact. Andrea further testified as follows:

> "We're sitting in the left-turn land, and we can't get through because the traffic is all blocked. And I saw the three girls come up, and I know one stayed by the sidewalk or she wasn't crossing, and the two girls were kind of zigzagging through the cars. And they went right in front of our truck and didn't stop to look and just kept running.
>
> And out of the corner of my eye, I saw a car coming from my right side, and I saw the impact. And I saw one girl go across the street more towards the Jewel parking lot over there, and then I saw another girl fly up in the air and go across the street towards over here."

As to the speed of defendant's vehicle as defendant was entering the intersection, Andrea testified as follows:

> "I'd say she was going around 40. I'd say in between 40 and 45 because she still had the green light. So she never stopped."

¶ 20      Jessica Roche, age 18, was also in Sara's vehicle sitting in the middle of the backseat at the time of the accident. Jessica testified in a discovery deposition that she did not observe the defendant's vehicle before impact, but that she "saw" the impact. Jessica testified she observed Natalie, the decedent and Evayn as they walked and then ran across the eastbound lanes and observed Natalie and the decedent continue into the westbound lanes. Jessica testified she was not sure if the defendant had applied her brakes before impact, but she was certain she did not hear any horns. Jessica further testified that everything happened within a couple of seconds. Jessica testified that the girls "weren't looking" and that they did not "pay attention to whether the light was green, whether the fact that [the pickup truck] was

blocking their view, and they couldn't see a thing."

¶ 21    Sharon Dorencz testified in a discovery deposition that she observed the decedent and another girl walking, not running, between the eastbound vehicles that were backed up on 131st Street, but that her view was "partially obstruct[ed]" by the vehicles in front of her. Sharon, who is employed as a court reporter, was on her way to a bank, traveling in the eastbound lanes of traffic, which was stopped because of the backup of the vehicles. She observed the two girls who were struck by defendant's vehicle when they started to cross the street. She only observed them for a short time before impact. She did observe them maneuver around stopped eastbound traffic and does not know whether they were in or out of the crosswalk at impact. She was not "really paying attention to them." Sharon further testified that after the decedent and Natalie "emerged to the left of the cars in front of [her]," she was not "concentrating on the two girls." Sharon testified there was no traffic facing westbound in the left turn lane at the time of the collision. Sharon testified she did not observe the defendant's vehicle strike Natalie, but observed, "out of the corner of [her] eye," the decedent go up in the air and land facedown in the street. Sharon testified that after the impact, she did not observe the decedent move and opined that the decedent was immediately unconscious. Sharon testified the impact point on the vehicle was the "front right side." Sharon testified she did not hear any tires screeching or any automobile horn.

¶ 22    Sharon testified that there are "always a lot of kids in the area" around 4 p.m. Sharon also testified that the speed limit of 40 miles per hour "seem[ed] a little high to [her]." Sharon testified that "30 [miles per hour] probably should be the highest [a driver] should be going" under the circumstances. Sharon testified she often tries to avoid the area, but when she is there, she reduces her speed because it is not unusual to observe children crossing between eastbound vehicles that are stopped at 131st Street. Sharon was aware of the two signs warning drivers of the crosswalk and the fact that there were children crossing at the intersection. Sharon had a conversation with Natalie at the scene after the collision. Natalie told her that the stopped eastbound vehicles "were waving them on." Sharon had a "impression" that the defendant brought her vehicle to a stop "very quickly after [the] accident." Sharon opined that a safe speed would have been in the thirties, not 40 miles per hour, in the area where the collision occurred because of the location of the school. Sharon further testified as follows:

> "I feel that the girls came out from between the cars, she's coming up going westbound and that she wouldn't be able to see them where they were and being in the left lane that they came out–I guess it's my assumption that they came out quickly and that there really was nothing that she could have done. That's my opinion."

¶ 23    Cesar Pacheco witnessed the collision from west of the intersection. Cesar testified in a discovery deposition he was driving a vehicle facing eastbound in the left turn lane of 131st Street, and intended to make a left turn into the Jewel. Cesar testified the defendant slowed down a bit before the light turned green for westbound traffic. Cesar testified that the first time he observed the girls was as they were "walking across the street," and that is when he also first observed the defendant's vehicle "coming." Cesar testified the girls then started running across the street and at that time a Dodge Ram blocked defendant's vision, so that "she could not see what was coming across from her." Cesar testified that the first girl was

-6-

then "hit on [the defendant's] right front bumper," and then he observed the decedent hit by the "front and center" of the defendant's vehicle. Cesar thought that the defendant could not have "seen" the girls before they entered her lane and that she had "no chance" to apply her brakes. Cesar also testified the girls did not see defendant's vehicle because they were crossing three lanes of traffic. Cesar testified he heard the defendant apply her brakes "right after" she struck the girls. Cesar estimated that the defendant was going "less than" the speed limit at the time of impact.

¶ 24　　Palos Park police officer Caiazzo testified in a discovery deposition that he was driving a vehicle eastbound that was caught up in the eastbound traffic jam on 131st Street at the time of the collision, and was familiar with the area. Caiazzo testified he had "gone through" the scene during school hours before and has gone there after school hours. Caiazzo testified that he had "seen kids run through the intersection" on prior occasions and that kids would "basically disobey the pedestrian crosswalk." Officer Caiazzo confirmed that at the time of the collision the east and westbound traffic had the green light and that the speed limit on 131st Street was 40 miles per hour. Caiazzo further testified that there are "pedestrian signs that show that there is a pedestrian crosswalk." Caiazzo explained that the signs indicated that drivers should "observe and take caution that there will be pedestrians crossing."

¶ 25　　Caiazzo's eyewitness testimony concerns observations that he made solely from his rearview mirror while he was stopped in eastbound traffic that was backed up. Caiazzo had been stopped at the light for "one to two minutes" before he observed Natalie and the decedent in his rearview mirror. Caiazzo testified he was "approximately three to four cars deep from the intersection," and that he remembered seeing a black vehicle turn out of a gas station and proceed westbound. At approximately the same time, Caiazzo heard someone shouting "Come on, come on" and thought that "somebody was telling to somebody to come on, to run." Caiazzo testified he did not observe the actual impact, but he observed a girl "run through to the rear of [his] vehicle" and then thought the impact "took place less than a second later." Caiazzo testified he then "activated [his] emergency lights and [he] immediately pulled into [the] westbound median lane" behind the defendant's vehicle. Caiazzo testified the decedent was "lying in the street" and she was not moving. Caiazzo testified he thought the defendant was driving "close to 35" miles per hour, and that he did not "believe she was at 40 or above 40." Caiazzo thought the impact occurred "between [the] stop line and the crosswalk." Caiazzo heard brakes screeching "almost simultaneously" with the impact. He could not tell how much time passed between when the defendant applied her brakes and when the impact occurred. Caiazzo testified the damage to the defendant's vehicle was to the license plate and "front center of the car." Caiazzo testified he requested that an accident reconstructionist be called in.

¶ 26　　Chicago Ridge police officer Eric Kaspar was subsequently called to the scene to investigate and reconstruct the collision. Kaspar was certified as an accident reconstructionist on November 15, 2006 after attending the Traffic Institute at Northwestern University. This incident was the first accident that he reconstructed and at the time of his discovery deposition on July 14, 2008, it was the only one.

¶ 27　　Kaspar testified that he arrived on the scene within an hour of the collision. Kaspar testified he took note of the traffic signals to make sure they were working, took

measurements, and spoke briefly with the defendant and Officer Caiazzo at the scene. He prepared his police report a week after the occurrence. Kaspar opined that the defendant was traveling between approximately 26.23 and 35.57 miles per hour at the start of her tire marks on the pavement, which he assumed was the point of impact. Kaspar testified that he reached these numbers by using a coefficient of friction of 0.70 based upon his "experience at the Northwestern Traffic Institute as to [the] type of road surface" and the "weather conditions." Kaspar testified that this coefficient of friction was "pretty standard." Kaspar explained that a coefficient of friction is the "rate that the tire skids along the roadway."

¶ 28    However, he did not take into consideration the make of defendant's vehicle. He assumed that the tire marks he found were made by defendant's front left tire. He assumed that defendant stopped before exiting the gas station and that she moderately accelerated her vehicle without evidence or verification from the driver or a witness. He assumed that the two girls were struck in the crosswalk and determined that defendant's vehicle ended up 33 feet from the crosswalk or point of impact. That assumption was based on the fact that he found no evidence of a friction mark from the decedent's footwear. The manner in which the officer was examined was troublesome because of the leading questions that were asked.[1] For example:

> "Q. And the trouble is, when your [*sic*] dealing with a pedestrian wearing sandals, they tend not to leave that type of stuff that I just went over?
>
> A. That's correct."

He assumed that the defendant's vehicle carried the decedent for a distance because the start of bloodstains on the pavement to where the decedent's body rested was 50 feet. He also had to assume that the blood belonged to the decedent. The officer was asked:

> "Q. That's why we don't have an actual point of [impact]?
>
> A. That's correct. I did my best to attempt to locate what we call a friction mark from the–
>
> Q. Sandal?
>
> A. –sandals but was unable to locate one within the roadway."

¶ 29    Kaspar testified that a speed of 35.57 miles per hour was the maximum speed at impact, and he opined that the defendant's vehicle was actually going slower at the time of impact. Kaspar explained that the minimum "perception to reaction time" is 1.5 seconds. Kaspar opined that the defendant had no time for evasive action after talking to defendant for a minute or a minute and a half. Kaspar did not ask the defendant if she had taken evasive actions or whether she was on her cell phone or if her vision was obstructed at the time of the collision. Kaspar admitted he should have asked those questions and that the answers to those questions "would be important to determine whether or not the collision *** was in fact unavoidable."

¶ 30    Kaspar also admitted that due to the warning signs on 131st Street, this was not an

---

[1]However, neither the trial court nor the appellate court can make credibility determinations in a summary judgment case. *AYH Holdings, Inc. v. Avreco, Inc.*, 357 Ill. App. 3d 17, 31 (2005).

unexpected occurrence. Kaspar opined that drivers should be watching to observe if children were passing between the stopped vehicles on 131st Street. Kaspar further believed that drivers should recognize that children do not "necessarily cross with the light all the time" and that drivers need to be vigilant and "careful with [their] speed." Kaspar opined that drivers need to "take note of their surroundings." In Kaspar's view, this means "scanning the streets" to determine if children are present and looking to see if children are actually moving through stopped traffic. Kasper testified on cross-examination that in his town if there is a street along a school, the speed is reduced to 20 miles per hour, "regardless of the type of roadway." Kasper provided a number of opinions that were objected to as invading the province of the jury or based upon lack of foundation (basis). We will not consider those opinions in our *de novo* review where the objection should have been sustained.[2]

¶ 31    Beine testified in a discovery deposition as a retained reconstruction expert for plaintiff. Beine recognized that the decedent had disregarded a "Don't Walk" signal, that defendant had a green light, the girls were crossing against the light, that eastbound traffic was backed up and that the decedent was "either in the crosswalk or just east of the crosswalk." Beine opined the girls should have obeyed the signals. Beine testified his "biggest" disagreement with Kaspar was him "using the child versus the adult in his analysis of the impact." Beine calculated the defendant's speed at between 33 to 36 miles per hour at impact. Beine testified that 33 miles per hour was the "minimum speed at impact." Beine agreed with the minimum "perception-reaction time" as 1.5 seconds. Beine also conceded that accident reconstruction is "not an exact science."

¶ 32    Beine opined that the defendant "would have minimized her risks by going slower," but that there is "probably not" a circumstance where that is not the case. Beine testified that since the defendant was driving by a school, it did not matter how many children were around the area. Beine opined that if the defendant "travels the road enough," as she testified she did, she should have known the dangers. Beine testified that the signs, the presence of the high school as well as the presence of the mall should have given the defendant some "knowledge of any hazards." Beine opined the knowledge of potential hazards was enough that the defendant "should have taken actions to help reduce any risks." Beine testified that had the defendant been driving 20 miles per hour, the decedent "could have cleared the lane."

¶ 33    The trial court granted defendant's motion for summary judgment, noting that the defendant "did what she could to brake" and it did not appear "that defendant could have done anything to have avoided this horrible accident." This appeal follows.

¶ 34                                    II. ANALYSIS
¶ 35                            A. Plaintiff's Basis for Appeal
¶ 36    Here, plaintiff challenges the trial court's grant of summary judgment in defendant's favor. On appeal, plaintiff claims that the trial court erred in granting defendant's motion for summary judgment because the evidence showed a genuine issue of material fact as to

---

[2]Even if we do not sustain any objections our opinion would be the same.

whether the occurrence was unavoidable. Specifically, plaintiff argues that, given defendant's knowledge of the proximity of the school and of the potential presence of children crossing the nearby crosswalk, whether defendant breached her duty to drive with ordinary care presents a genuine issue of material fact. Plaintiff also argues that the question of negligence and contributory negligence is one that should go to the jury.

¶ 37                                    B. Standard of Review

¶ 38        A grant of summary judgment is only appropriate when the pleadings, depositions, admissions, and affidavits demonstrate no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2008); *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). With regard to analyzing summary judgment motions, our supreme court has stated the following:

> "In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent. A triable issue precluding summary judgment exists where the material facts are disputed or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts. Although summary judgment can aid in the expeditious disposition of a lawsuit, it remains a drastic means of disposing of litigation and, therefore, should be allowed only where the right of the moving party is clear and free from doubt. [Citation.] If the plaintiff fails to establish any element of the cause of action, summary judgment for the defendant is proper." *Williams*, 228 Ill. 2d at 417.

¶ 39        Moreover, our supreme court has recognized that, if what is submitted to the trial court in support of and in response to the summary judgment motion would have constituted all of the evidence before the court and, upon such evidence, nothing would be left to go to a jury and the court would be required to direct a verdict, then a summary judgment should be entered. *Fooden v. Board of Governors of State Colleges & Universities of Illinois*, 48 Ill. 2d 580, 587 (1971).

¶ 40        Whether or not the trial court erred in granting summary judgment to defendant is a question of law and subject to a *de novo* standard of review. *Williams*, 228 Ill. 2d at 417. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). As such, we will "examine the evidence unconstrained by the reasoning of the trial court." *John E. Reid & Associates, Inc. v. Wicklander-Zulawski & Associates*, 255 Ill. App. 3d 533, 538 (1993) (citing *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90 (1992)).

¶ 41        In order to succeed in an action alleging negligence, a plaintiff must demonstrate that the defendant owed a duty of care to plaintiff, that the defendant breached that duty, and that the breach proximately caused plaintiff's injury or death. *Morrissey v. Arlington Park Racecourse, LLC*, 404 Ill. App. 3d 711, 724 (2010) (citing *Bajwa v. Metropolitan Life Insurance Co.*, 208 Ill. 2d 414, 421 (2004)); *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 430 (2006). Whether a defendant's action or omission represented a breach of duty and whether such action or omission proximately caused the plaintiff's injury or death are

generally issues of fact to be decided by a jury. *Thompson v. Gordon*, 241 Ill. 2d 428, 439 (2011).

¶ 42                                    C. Legal Analysis

¶ 43     In the case at bar, the trial court granted defendant's motion for summary judgment, stating, "it does not appear that there was any breach of duty on the part of the defendant and the defendant was not the proximate cause of the accident." On appeal, plaintiff argues that the circuit court erred in granting the defendant summary judgment because there was a genuine issue of material fact as to whether defendant breached her duty to plaintiff and whether that breach is a proximate cause of the decedent's death.

¶ 44     This case involves a wrongful-death action. "[T]he representative's wrongful-death action is derived from the decedent's cause of action and is limited to what the decedent's cause of action against the defendant would have been had the decedent lived." *Williams*, 228 Ill. 2d at 422.

¶ 45     In her response to plaintiff's complaint, defendant asserts that Cassandra was contributorily negligent. Section 2-1116 of the Code of Civil Procedure (735 ILCS 5/2-1116 (West 2008)) bars a plaintiff whose contributory negligence is more "than 50% of the proximate cause of the injury or damage for which recovery is sought" from recovering any damages. *Hobart v. Shin*, 185 Ill. 2d 283, 290 (1998). A plaintiff is contributorily negligent when he or she acts without the degree of care that a reasonably prudent person would have used for his or her own safety under like circumstances and that action is a proximate cause of his or her injuries or death. *Basham v. Hunt*, 332 Ill. App. 3d 980, 995 (2002). The degree of care to be exercised by a minor over the age of seven is that which a reasonable careful person of the same age, capacity and experience would exercise under the same or similar circumstances. *Wolf v. Budzyn*, 305 Ill. App. 603, 605 (1940); *Hartnett v. Boston Store of Chicago*, 265 Ill. 331, 335 (1914). Generally, in the case of a minor, the issue of contributory negligence is a question of fact for the jury, but it does become a question of law "when all reasonable minds would agree that the evidence and the reasonable inferences therefrom, viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." *Basham*, 332 Ill. App. 3d at 995. However, when there is a showing of contributory negligence on behalf of a plaintiff, the trier of fact makes the determination as to the percentage of contributory negligence. *Johnson v. Colley*, 111 Ill. 2d 468, 475 (1986). Here, there is no question that the decedent was contributorily negligent. However, there is a question as to the percentage of her contributory negligence. We will explain our analysis of the contributory negligence issue later in this opinion.

¶ 46     With a summary judgment motion, the trial court does not decide a question of fact but, rather, determines whether one exists. Thus, a court cannot make credibility determinations or weigh evidence in deciding a summary judgment motion. *AYH Holdings*, 357 Ill. App. 3d at 31.

¶ 47                                    1. Negligence

¶ 48        In the present case, the existence of duty for the defendant is not in dispute. Illinois law states, in relevant part, "[n]otwithstanding other provisions of [the Illinois Vehicle] Code *** , every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian." 625 ILCS 5/11-1003.1 (West 2008). Illinois law further states, in relevant part, that "[t]he fact that the speed of a vehicle does not exceed the applicable maximum speed limit does not relieve the driver from the duty to decrease speed when approaching and crossing an intersection *** or when special hazards exists with respect to pedestrians." 625 ILCS 5/11-601(a) (West 2008). The parties in the present case do not dispute the existence of the defendant's duty to pedestrians (and, therefore, the decedent) to operate her vehicle with ordinary care and caution.

¶ 49        In the case at bar, the speed limit in the area was 40 miles per hour and many witnesses opined that defendant was within that speed. The expert witnesses support the fact that defendant was driving within the speed limit. However, witness Andrea Colisimo opined that defendant was driving between 40 and 45 miles per hour as she entered the intersection. Defendant admitted that she was familiar with the area and knew that there was a high school in the vicinity. Defendant was a school teacher herself and should know that she had to be extremely cautious in a school area. Children, however carefully they are instructed by their parents and teachers, have their minds upon any of a hundred other matters.

¶ 50        Witness Sharon Dorencz, employed as a court reporter, witnessed the impact. Sharon testified that there are "always a lot of kids in the area" around 4 p.m. Sharon testified that the speed limit of 40 miles per hour "seem[ed] a little high to [her]." Sharon testified that "30 [miles per hour] probably should be the highest [a driver] should be going" under the circumstances. Sharon testified that she often tries to avoid the area, but when she is there, she reduces her speed because it not unusual to observe children crossing between eastbound vehicles that are stopped at 131st Street. Sharon was aware of the two signs warning drivers of the crosswalk, as was the defendant, and the fact that there were children crossing at the intersection. Sharon had a conversation with Natalie at the scene who told her that stopped eastbound vehicles "were waving them on."

¶ 51        Reconstruction expert, Chicago Ridge police officer Eric Kaspar, opined that drivers should be watching to observe if children were passing between the stopped vehicles on 131st Street. Kaspar opined that drivers should recognize that children do not "necessarily cross with the light all the time" and that drivers need to be vigilant and "careful with [their] speed." Kaspar testified on cross-examination that, in his town, if there is a street along a school, the speed is reduced to 20 miles per hour "regardless of the type of roadway."

¶ 52        Plaintiff's retained expert Warren Beine, an accident reconstruction expert, opined that the defendant "would have minimized her risks by going slower," but that there is "probably not" a circumstance where that is not the case. Beine testified that since the defendant was driving by a school, it did not matter how many children were around the area. Beine opined that if the defendant "travels the road enough," as she testified she did, she should have known of the dangers. Beine testified that the signs, the presence of the high school as well as the presence of the mall should have given the defendant some "knowledge of any

hazards." Beine opined the knowledge of potential hazards was enough that the defendant "should have taken actions to help reduce any risks." Beine testified that had the defendant been driving 20 miles per hour, the decedent "could have cleared the lane."

¶ 53    The failure of a driver to decrease the speed of her vehicle to avoid striking a pedestrian is usually for the jury to decide, even when the vehicle is operated within the speed limit. The question for the jury to determine is whether there would be a need to reduce the speed in an area where a school is located. *Panos v. McMahon*, 23 Ill. App. 3d 776 (1974); *Houston v. Zimmerman*, 30 Ill. App. 3d 425 (1975); *Coleman v. Hermann*, 116 Ill. App. 3d 448 (1983). A driver must take special care when she knows children are in the area (*Cooper v. Miller*, 67 Ill. App. 3d 349 (1978); *Figarelli v. Ihde*, 39 Ill. App. 3d 1023 (1976)), especially when she is within 100 feet of an intersection. *Agnello v. Puzzo*, 110 Ill. App. 3d 913 (1982). "Whether conduct was negligent or contributorily negligent is rarely decided as a matter of law. The determination of what conduct is negligent or contributorily negligent is a composite of the experiences of average people, and is left to the jury for evaluation." *Johnson v. Colley*, 111 Ill. 2d 468, 475 (1986).

¶ 54    Defendant basically contends that she was driving within the speed limit and had little or no time to react when Natalie and the decedent ran in front of her vehicle. Defendant responds to plaintiff's assertions of a factual question by calling the collision unavoidable. We find this argument unpersuasive for summary judgment purposes. In effect, classifying the collision as unavoidable is merely a restatement of the totality of defendant's arguments that there is no genuine issue of material fact. In support of this contention, defendant argues also that her speed at the time of the collision was below the posted speed limit of 40 miles per hour; that there were no schoolchildren present other than the decedent and her two friends; and that the collision occurred after school hours. The desired implication of these contentions is that defendant was exercising due care in the operation of her automobile.

¶ 55    Plaintiff responds by citing *Stowers v. Carp*, 29 Ill. App. 2d 52 (1961). In *Stowers*, the defendant's employee drove a company truck through an alley which was located between the rear yards of residential homes, which were located on each side of the alley. The employee struck and injured a five-year-old boy while driving the truck through the alley. The plaintiff, the mother of the boy, brought a negligence action against the defendant alleging that the defendant knew or, in the exercise of reasonable care, should have known that a large number of children lived in the homes on both sides of the alley and used the rear yards of their homes as a play area, and that the employee failed to maintain a proper lookout, failed to stop, failed to sound a warning, and failed to use due care or sound a horn. The jury returned a verdict for the plaintiff and a judgment was entered in her favor. The defendant appealed and claimed that there was a complete absence of evidence of its negligence. The Third District of the Appellate Court disagreed and found as follows:

> "Where children are known to be or may reasonably be expected to be in the vicinity, a degree of vigilance commensurate with the greater hazard created by their presence or probable presence is required of a driver of a motor vehicle to measure up to *** ordinary care ***." *Stowers*, 29 Ill. App. 2d at 64.

¶ 56                           2. Contributory Negligence

¶ 57    Defendant further raises the argument of contributory negligence on the part of the plaintiff's decedent. Defendant argues that the decedent failed to obey the crossing signal and look for oncoming traffic prior to crossing the street and, therefore, was more than 50% negligent.

¶ 58    Illinois law has usually dictated that the percentage of negligence that attaches to a pedestrian's negligence is a question of fact. *Zeller v. Durham*, 33 Ill. App. 2d 273, 279 (1962) (citing *Moran v. Gatz*, 390 Ill. 478, 486 (1945)).

¶ 59    In the case at bar, the percentage of the decedent's contributory negligence could be affected by Officer Caiazzo's testimony that he heard someone shouting "come on, come on" and thought that "somebody was telling to somebody to come on, to run." In addition, witness Sharon Dorencz testified that Natalie told her that the stopped eastbound vehicles "were waiving them on."

¶ 60    The evidence that was presented in this case raises a factual question as to the decedent's percentage of contributory negligence and as to whether the defendant was operating her motor vehicle with ordinary care based on the fact that she knew a high school was in the area, and the wide ranges of speed that the witness testimony reveals she was traveling. A reasonable jury may differ as to whether the defendant was exercising the degree of care commensurate with the greater hazard created by the potential presence of children in the area. A reasonable jury may also differ as to whether it finds that the decedent's death was a direct and proximate result of defendant's negligence or as to the percentage of the decedent's contributory negligence. There are factual issues that should be decided by a jury. A trial court would not have directed a verdict for the defendant from the evidence that is before us. Accordingly, this case satisfies the *Fooden* requirements, and the trial court improperly entered summary judgment.

¶ 61                                 III. CONCLUSION

¶ 62    The present case contains genuine issues of material fact and was therefore not fit for summary judgment. Summary judgment is not to be granted in cases presenting a genuine issue of a material fact. For the foregoing reasons, we reverse the trial court's decision to grant summary judgment in favor of the defendant and remand the case for further proceedings.

¶ 63    Reversed and remanded.